**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
DAMON FIELDS

Case No.:

              Plaintiff,                                    **COMPLAINT**

     - against -

NEW YORK CITY HOUSING AUTHORITY,                **PLAINTIFF DEMANDS**
RUDY MURILLO, ANTHONY LUCIANO,                    **TRIAL BY JURY**
SYLVIA AUDE-MCCULLOUGH, KIMBERLY TAYLOR,
LATOYA RAMSEUR-DELIOTTE, CAROLYN GIBBS,
ROBIN YUDKOVITZ, AMANDA DONOHUE,
MARLA EDMONSON, and SHARDA SHRESTHA
in his/her/their individual and professional capacities,

              Defendants.

-------------------------------------------------------------X

     Plaintiff Damon Fields, pro se, hereby complains of Defendants New York City Housing

Authority ("NYCHA" or the "Company"), Rudy Murillo, Anthony Luciano, Sylvia Aude-

Mccullough, Kimberly Taylor, LaToya Ramseur-Deliotte, Carolyn Gibbs, Robin Yudkovitz,

Amanda Donohue, Marla Edmonson,  Sharda Shrestha (together, "Defendants"), upon personal

knowledge, as well as information and belief, by alleging and averring as follows:

## PRELIMINARY STATEMENT

     1.     Plaintiff  Damon Fields's experience at the New York City Housing Authority

Corporation ("NYCHA")—the largest public housing authority in North America—was deeply

marred by Defendants engaging in a sustained pattern of unlawful discrimination, retaliation,

interference with his rights under the Americans with Disabilities Act ("ADA/ADAAA"), his

wrongful termination, and via the creation of a hostile work environment. These actions began

shortly after Plaintiff requested lawful reasonable accommodations for his disabilities-ailments

1

including depression, anxiety, ocular migraines, migraines, and a sleep disorder—and continued in furtherance of Defendant's concerted efforts to deny Plaintiff's rights on multiple occasions.

2.      Rather than providing lawful and appropriate accommodations for the above, or engaging in a good faith interactive process to address potential accommodations, Defendants— including his supervisors and assorted Human Resources personnel, et al.—subjected Plaintiff to a pattern of retaliatory and discriminatory conduct. This included the denial of any temporary accommodations, with placing Plaintiff on involuntary unpaid medical leave for thirty-four (34) days; and also via stripping Plaintiff of job duties, issuing baseless counseling memoranda, and subjecting him to unwarranted disciplinary actions and also via imposing multiple unnecessarily restrictive working conditions and thru forced assignments to difficult to reach work locations.

3.      Following Plaintiff's reassignment from NYCHA's Emergency Management Services Department ("EMSD") to the Public Housing Tenancy Operations Department ("PHTO"), the pattern of mistreatment intensified. Plaintiff was denied access to training and essential equipment necessary to perform his job; subjected to constant, excessive, and targeted reporting demands, micromanagement and also via compelled assignment to hardship locations.

4.      Plaintiff repeatedly reported this unlawful treatment to NYCHA's Human Resources Dept., their Department of Equal Opportunity ("DEO"), and through other internal channels. Defendants responded accordingly by escalating their retaliation and subsequently taking additional adverse actions against him.

5.      On January 19, 2023, Plaintiff filed a formal Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") against the Defendants Murillo, Luciano, Taylor, and Yudkovitz, alleging discrimination, retaliation, interference, and hostile work environment. Within fifteen (15) days of his filing, Defendants culminated their retaliatory,

malfeasant conduct by wrongfully terminating Plaintiff's employment on February 3rd, 2023.

6.    Plaintiff further alleges following his unlawful termination, he was effectively and purposely 'blacklisted' (impermissibly precluded) from future NYC job opportunities, by proxy effectively ostracized from NYC civil service, and as of this filing continues to suffer harm as a direct and foreseeable consequence of Defendants' unlawful conduct and their concerted willful animus.

7.    As a result of the unlawful actions described herein, Plaintiff brings this action seeking injunctive, declaratory, and monetary relief against Defendants for violating his rights under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101, et seq., as amended by the ADA Amendments Act of 2008, Pub. L. No. 110-325 ("ADAAA"), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, the New York State Human Rights Law, New York State Executive Law, §§ 296 et seq. ("NYSHRL"); and the New York City Human Rights Law, New York City Administrative Code §§ 8-101, et. seq. ("NYCHRL").

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's civil rights under the ADA.

9.    This Court has supplemental jurisdiction over Plaintiff's related claims arising under New York law pursuant to 28 U.S.C. § 1367(a).

10.    Venue is proper in this district pursuant to 28 U.S.C. § 1391, as NYCHA is a domestic corporation doing business in the State of New York and a substantial part of the events or omissions giving rise to this action, including the unlawful discrimination, retaliation, ADA interference, blacklisting, and hostile work environment alleged herein, occurred in this district.

## ADMINISTRATIVE REQUIREMENTS

11.    On January 19, 2023, Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging violations of the ADAAA arising out of the facts described herein.  On July 11, 2025, the EEOC issued Plaintiff a Notice of Right to Sue. Plaintiff has asserted his ADAAA and Rehabilitation Act claims, etc., herein within 90 days of receipt of his Notice of Right to Sue.

12.    Pursuant to NYCHRL § 8-502, unless Defendants waive service, Plaintiff will serve a copy of this Complaint upon the New York City Commission on Human Rights, 22 Reade Street, New York, NY 10007, and the New York City Law Department, Office of the Corporation Counsel, 100 Church St, New York, NY 10007, thereby satisfying the notice requirements of that section.

13.    Any and all other prerequisites to the filing of this suit have been duly met.

## PARTIES

14.    Plaintiff is an adult resident of the State of New York and the County of Queens. Plaintiff was a Field Coordinator at the Office of Emergency Management ("OEM")/Emergency Services Management Department ("EMSD") at NYCHA from on or about November 18, 2021 to September 12, 2022, and was also a 'Community Coordinator' at NYCHA's Public Housing Tenancy Operations ("PHTO"), working at this position from on or about October 17, 2022, until his unlawful firing on February 3, 2023.  At all relevant times, Mr. Fields met the definition of "employee" and/or "eligible employee" under all applicable statutes and NYC guidelines.

15.    At all times relevant hereto, Defendant NYCHA was/is a public benefit corporation organized and existing under the New York State Public Housing Law to provide "safe, decent, affordable housing for low-income residents within the five boroughs" of New York City.

16.     More than 369,000 New Yorkers reside in NYCHA's housing developments, including developments that have been converted via PHTO under the Permanent Affordability Commitment Together ("PACT")/Rental Assistance Demonstration ("RAD") programs, and another 201,000 + tenants who receive subsidized rental assistance in private homes through the NYCHA-administered Section 8 Leased Housing Program. NYCHA employs more than 12,500 employees in various titles.  NYCHA is an equal opportunity employer with "posted" policies prohibiting discrimination and retaliation in the terms and conditions of employment based on a number of protected classes, including disability.  NYCHA receives significant federal funding, with 70% of its operational budget and 40% of its capital budget coming from federal sources like HUD.  NYCHA maintains its principal places of business at 250 Broadway, Manhattan, NY 10007 and at 90 Church Street, Manhattan, NY 10007.  At all relevant times, NYCHA met the definition of an "employer" and/or a "covered employer" under all relevant statutes and laws.

17.     At all times relevant hereto, Defendant Rudy Murillo served as Director/Acting Director of OEM/EMSD and functioned as Plaintiff's direct supervisor beginning in or around November 2021 and had the ability to affect the terms and conditions of Plaintiff's employment. Defendant Murillo assigned Plaintiff's work, issued counseling memoranda, ostensibly evaluated Plaintiff's job performance, approved or denied leave requests, and reviewed and made decisions about reasonable accommodation requests.  He directly engaged in discriminatory and retaliatory conduct against Plaintiff, including in personally creating and the perpetuating of a hostile work environment and interfering with Plaintiff's rights under the ADAAA.  Defendant Murillo also coordinated with other supervisors and Human Resources employees to retaliate against Plaintiff following his accommodation requests and protected complaints. Murillo failed to engage in the mandatory interactive process concerning Plaintiff's reasonable accommodation request, and so

also willfully denied Plaintiff said true reasonable accommodations, while actively contributing to adverse actions taken against the Plaintiff for his requesting such.  At all relevant times, Mr. Murillo met the definition of a "person," "employer" and/or a "covered employer" under all relevant statutes.  Upon information and belief, Defendant Murillo is an employee of the City of New York, County of Queens.

18.    At all times relevant hereto, Defendant Anthony Luciano served as a Deputy Director of EMSD and functioned as Plaintiff's direct supervisor beginning in or around August 2022 and therefore had the authority to fully affect the terms and conditions of said Plaintiff's employment, including assignments, leave, and accommodations.   Defendant Luciano directly participated in discriminatory and retaliatory conduct and maintained a hostile work environment for Plaintiff. He worked closely with Defendant Murillo to undermine Plaintiff's performance, interfere with Plaintiff's protected rights, and to retaliate following Plaintiff's lawful requests for reasonable accommodations and complaints of improper treatment.  Defendant Luciano failed to engage in the interactive process, helped deny Plaintiff's reasonable accommodations, and also actively contributed to the adverse employment actions taken against Plaintiff.  At all relevant times, Mr. Luciano met the definition of a "person," "employer" and/or a "covered employer" under all relevant statutes. Upon information and belief, Defendant Luciano is an employee of the City of New York, County of Bronx.

19.    At all times relevant hereto, Defendant Sylvia Aude-McCullough served as Senior Vice President of PHTO and supervised Defendant Taylor.   Aude-McCullough had the ability to affect the terms and conditions of Plaintiff's employment. She was a member of the management team given authority to approve adverse employment actions and also for Plaintiff's termination. Defendant Aude-McCullough reviewed and approved said adverse actions against Plaintiff, was

6

fully aware of the discriminatory and retaliatory motives underlying those actions, yet failed to intervene when alerted to Plaintiff's complaints. She ratified the unlawful conduct by authorizing Plaintiff's termination.  At all relevant times, Mrs. Aude-McCullough met the real definition of a "person," "employer" and/or a "covered employer" under all relevant statutes.  Upon information and belief, Defendant Aude-McCullough is an employee of the City of New York, County of New York.

20.    At all times relevant hereto, Defendant Kimberly Taylor served as the Director of PHTO and began supervising Plaintiff around October 2022, having the authority to affect the terms and conditions of Plaintiff's employment.  She was a key member of the management team with authority to approve adverse employment actions, including as with Plaintiff's termination. Defendant Taylor was responsible for Plaintiff's oversight and working conditions. Despite her knowledge of Plaintiff's valid complaints of malfeasance, she failed to act and instead directly participated in adverse actions against Plaintiff, including constructive demotion, his inadequate training, an improper and untimely 'evaluation', and his wrongful termination. Defendant Taylor operated in full concert with Defendants Gibbs, Ramseur-Deliotte, Yudkovitz, Donohue, and Edmonson, and also under the oversight of Aude-McCullough.  At all relevant times, Ms. Taylor met the full definition of a "person," an "employer" and/or a "covered employer" under all relevant statutes.  Upon my information and belief, Defendant Taylor is an employee of the City of New York, County of New York.

21.    At all times relevant hereto, Defendant LaToya Ramseur-Deliotte served as Assistant Director of PHTO and became Plaintiff's supervisor around October 2022.  Defendant Ramseur-Deliotte had authority to influence the terms and conditions of Plaintiff's employment and was a member of the management team authorized to approve Plaintiff's termination. She

participated in constructively demoting Plaintiff and actively engaged in the discriminatory and retaliatory conduct that culminated in Plaintiff's wrongful termination. Defendant Ramseur-Deliotte acted in concert with Defendants Taylor, Gibbs, Aude-McCullough, R. Yudkovitz esq., Donohue, and Edmonson, et al., reporting to and receiving direction from them in implementing the discriminatory policies and decisions.  At all relevant times, Mrs. Ramseur-Deliotte met the definition of a "person," "employer" and/or a "covered employer" under all relevant statutes. Upon information and belief, Defendant Ramseur-Deliotte is an employee of the City of New York, County of New York.

22.     At all times relevant hereto, Defendant Carolyn Gibbs served as a Housing Manager at PHTO.  Defendant Gibbs functioned as Plaintiff's direct supervisor beginning in October 2022 and had the ability to affect the terms and conditions of Plaintiff's employment. She was a member of the management team with authority to approve Plaintiff's termination. She assigned Plaintiff's work, issued counseling memoranda, evaluated Plaintiff's performance, and influenced leave decisions. Defendant Gibbs constructively demoted Plaintiff while denying him adequate training, and actively participated in discriminatory and retaliatory conduct which culminated in Plaintiff's wrongful termination. She acted in full concert with Defendants Taylor, Ramseur-Deliotte, Aude-McCullough, Yudkovitz, Donohue, and Edmonson, reporting to them and receiving direction in executing discriminatory policies and decisions. Defendant Gibbs was well aware of Plaintiff's accommodation needs and complaints but failed to act.  At all relevant times, Ms. Gibbs met the definition of a "person," "employer" and/or a "covered employer" under all relevant statutes.  Upon information and belief, Defendant Gibbs is an employee of the City of New York.

23.     At all times relevant hereto, Defendant Robin Yudkovitz, an attorney, served as NYCHA's HR Director of Labor and Employee Relations. She so held herself responsible for responding to Plaintiff's complaints and wielded the authority to address and remedy unlawful conduct. Improperly, she ratified the actions of subordinates and refused to investigate or correct ongoing hostile work environment(s), discrimination, retaliation, and interference.  Defendant Yudkovitz has actively participated in, contributed to, and also approved of the varying adverse actions against Plaintiff and was hence fully aware of the discriminatory and retaliatory animus motivating those actions. She routinely handled and approved of any reasonable accommodation requests in her official capacity, yet engaged in disparate treatment between the Plaintiff and his similarly situated co-worker in her **not** addressing Plaintiff's legitimate concerns.  At all relevant times, Robin Yudkovitz met the real definition of a "person," "employer" and/or a "covered employer" under all relevant statutes.  Upon information and belief, Defendant Yudkovitz is an employee of the City of New York, County of New York.

24.     At all times relevant hereto, Defendant Amanda Donohue served as NYCHA's Deputy Director of Employee Relations and had substantial authority to impact the Plaintiff's employment.  She oversaw disciplinary processes, collaborated with HR and Legal, and signed off on Plaintiff's termination. Defendant Donohue ignored Plaintiff's steadfast complaints of discrimination and retaliation, failed to conduct an impartial investigation of any kind, and also actively participated in retaliatory actions. She worked in tandem with Defendants Edmonson, Yudkovitz, Taylor, Ramseur-Deliotte, Gibbs, and Aude-McCullough in carrying out Plaintiff's termination.  At all relevant times, Ms. Donohue met the definition of a "person," "employer" and/or a "covered employer" under all relevant statutes.  Upon information and belief, Defendant Donohue is an employee of the City of New York, County of New York.

25.    At all times relevant hereto, Defendant Marla Edmonson served as the Employee Relations Coordinator in NYCHA's HR Employee Relations Division with over twenty-six (26) years of experience in that department. She directly advised supervisors, including Defendants Murillo, Luciano, Aude-McCullough, Taylor, Ramseur-Deliotte, and Gibbs, on set disciplinary procedures and played an active role in facilitating Plaintiff's illegal and untimely evaluation and ensuing termination. Edmonson's conduct enabled and furthered both the discriminatory and the retaliatory actions taken against Plaintiff. Defendant Edmonson was properly contacted multiple times regarding Plaintiff's complaints of discrimination and retaliation yet failed to act, refused to even conduct an impartial investigation, and obstructed attempts to address these issues at every turn.  At all relevant times, Ms. Edmonson met the definition of a "person," "employer" and/or a "covered employer" under all relevant statutes.  Upon information and belief, Defendant Edmonson is an employee of the City of New York, County of New York.

26.    At all times relevant hereto, Defendant Sharda Shrestha served as NYCHA's Employee Reasonable Accommodation Coordinator (ERAC) and was a member of the Return-To-Office (RTO) team. She was responsible for reviewing Plaintiff's accommodation requests and coordinating their implementation. Despite being aware of Plaintiff's needs and protected status, Shrestha failed to engage in any interactive processes. Her willful inaction contributed to Plaintiff's adverse treatment. Defendant Shrestha was repeatedly informed of the adverse actions taken against Plaintiff and was fully aware of both the discriminatory and the retaliatory animus motivating those actions. She engaged in disparate treatment and failed to intervene or to report unlawful conduct upon receiving complaints. She worked closely with the Defendants Murillo, Luciano, and Human Resources staff including Defendants Yudkovitz and Donohue.  At all

relevant times, Ms. Shrestha met the definition of a "person," "employer" and/or a "covered employer" under all relevant statutes,  Upon information and belief, Defendant Shrestha is an employee of the City of New York, County of New York.

## 1.  FACTUAL ALLEGATIONS

I.  **Plaintiff's Hiring and NYCHA's Credentialing Practices**

26.    Defendant NYCHA follows a multi-step hiring process governed by DCAS job specifications, which establishes minimum qualifications for civil service positions. NYCHA's Human Resources Classification Unit verifies credentials, monitors compliance, and enforces corrective measures for deficiencies. Hiring unqualified candidates constitutes a per se violation of civil service law, and DCAS retains independent authority to audit and disqualify improperly appointed individuals. When a valid New York State driver's license is required, it is explicitly stated in the job posting, and must be quantified prior to any actual employment.

27.    In April 2021, Plaintiff applied for the Field Coordinator position at NYCHA's Office of Emergency Management ("OEM"). The job posting required a bachelor's degree and also two years of relevant experience; a valid NYS driver's license was listed only as a **preferred** qualification. Plaintiff completed two interviews and received a conditional offer in October 2021. He submitted all required onboarding documents—including a valid Hawaii driver's license—which were accepted and placed in his personnel file. NYCHA's Driver License Certification Form confirmed that this position **did not** require a NYS license. Plaintiff was cleared by both the Classification and Employment Units and officially began working on November 18, 2021.

28.    Plaintiff was appointed as a Field Coordinator, holding the civil service title of Community Coordinator, at NYCHA's OEM office located at 24-02 49th Avenue, Long Island City, NY. His responsibilities included emergency response, operational readiness, intra-agency coordination with ESD Administrators and Property Managers, and interagency coordination

with NYC first responders. Plaintiff's regular schedule was 9:00 a.m. to 5:00 p.m., Monday through Friday.

29.    Although NYCHA accepted Plaintiff's credentials at the time of hire, it later used those same qualifications—previously deemed sufficient—as a pretext for adverse employment actions.

## II.    Defendant Murillo and Ms. Melody Torres Initially Accommodated Plaintiff's Inability to Drive

30.    Shortly after Plaintiff was hired, Defendant Rudy Murillo instructed Plaintiff to perform driving duties occasionally as part of his role, which he did without incident and without Plaintiff questioning such directives. Plaintiff's lack of a NYS license only later became relevant.

31.    On or about February 4, 2022, Plaintiff met with Murillo via Microsoft Teams to discuss issues related to converting his valid Hawaii driver's license to a New York State license.

32.    During this meeting, Murillo informed Plaintiff that he would then be temporarily 'accommodated' by being assigned to headquarters-based duties at the Long Island City Watch Command until he obtained a New York State license. Murillo stated: "To **accommodate,** Mr. Fields has been working as Watch Command until his license can be changed, and he can be included in the field response rotation."

33.    In the same meeting, Murillo stated:

> "I informed Mr. Fields that if this continues to be a problem, we may have to re-evaluate your position/duties within the department. 'Employee assumed/perceived this to be a threat on his employment with NYCHA as he did not understand NYCHA OEM dept as a whole and the different items we work on (covered by the employee orientation)".

34.    During the February 4, 2022, meeting, Plaintiff also reported that coworker Francisco Resto had been improperly asserting supervisory authority and signing documents

without authorization. Murillo responded claiming only he and Manager Melody Torres were **official supervisors** within the department authorized to sign off on pertinent documentation.

35.     Murillo worked remotely 3 days per week, and Torres was fully remote due to a 'physical disability'. Plaintiff had minimal mortal interaction with Ms. Torres during his tenure.

36.     Following the above meeting, Murillo sent a follow-up email summarizing it.

37.     Despite Plaintiff completing almost all assigned duties and meeting all goals, Plaintiff still received an unsatisfactory performance review on or about February 17, 2022.

38.     On March 10, 2022, Plaintiff obtained an interim New York State driver's license, making him 'eligible' to operate NYCHA vehicles for the first time.  Prior to this, Plaintiff occasionally used agency vehicles for the convenience of doing department tasks and tests only. Driving had not been a formal requirement of his role expressed to him at the time of his hire.

39.     In April 2022, NYCHA merged the Office of Emergency Management ("OEM") with the Emergency Services Department ("ESD"), eventually forming the NYCHA Emergency Management and Services Department ("EMSD").

40.     On or about May 3, 2022, Plaintiff notified Manager Torres that his temporary driver's license was set to expire, and his permanent license had been mailed to an incorrect address. Torres responded that Plaintiff could continue working at Watch Command until the paperwork was corrected. The Watch Command post at LIC headquarters remains continuously staffed up to today and was available to be utilized by staff before, during and after the merger.

41.     The standard operating procedure for the OEM daytime team required one member to be assigned to the field and the other to Watch Command. Plaintiff was assured by Field Coordinator Francisco Resto he could remain in a Watch Command assignment and that driving was optional, consistent with the terms mutually discussed before/at the time of his hire.

42.      NYCHA's hiring practices and subsequent driving accommodations confirmed Plaintiff was fully qualified for the Field Coordinator position while working as such, as driving and/or driving solo was optional.

### III.   Plaintiff Develops Mental Health Conditions Due to Hostile Work Environment and Francisco Resto's Conduct

43.      On May 7, 2022, Plaintiff sought treatment for anxiety and depression due to the severe stress caused by management's abusive conduct. Plaintiff had no prior history of mental illness. His medical provider confirmed workplace stress was exacerbating his existing migraines & ocular migraines, contributing to insomnia, and adversely affecting attendance & punctuality.

44.      On May 9, 2022, Plaintiff was reassigned to Watch Command duties pending resolution of driver licensing issues.

45.      On or about May 13, 2022, Plaintiff discovered Field Coordinator Mr. Francisco Resto had conducted unauthorized staff performance evaluations in violation of NYCHA policy. Plaintiff obtained photographic evidence of this conduct, including a calendar entry labeled *"send over eval."* Resto admitted to this practice to several OEM Field Coordinators at LIC.

46.      On May 17, 2022, Plaintiff received another unwarranted "unsatisfactory" rating as his second quarterly performance evaluation.

47.      On June 6, 2022, Plaintiff obtained a full driver's license, rendering him eligible to operate the Incident Coordination Response Vehicle ("ICRV") van.  Despite then obtaining a New York State driver's license, Plaintiff's assignment to OEM Watch Command continued, as driving was not essential to his position either before or after a compelled OEM-EMSD merger.

48.      From November 18, 2021, to June 5, 2022, Plaintiff worked Watch Command approximately 47% of the time, because he did not possess a NY driver's license.  Additionally, Field Coordinators rarely operated vehicles or responded to emergency incidents.

For the remainder of the time, Plaintiff performed normal OEM responder administrative duties

49.     Defendants later acknowledged in their Position Statement submitted to the EEOC that during Plaintiff's tenure at OEM, he: *"primarily worked in the Center Command from 9:00 a.m. to 5:00 p.m.; he provided field response only occasionally."*

50.     Throughout his tenure, Plaintiff frequently performed Watch Command duties comparable to those carried out by Administrators (Administrative Housing Superintendents) stationed by the EMSD "Tank" in Long Island City. While cross-training for Administrator Tank roles was planned, driving was never identified as an essential duty for Field Coordinators.

51.     On June 15, 2022, Plaintiff submitted a formal rebuttal to Human Resources, refuting his second performance evaluation; including providing cogent photographic evidence of FC Resto's unauthorized conduct pertaining to such.

52.     Upon information and belief, Francisco Resto issued both negative performance evaluations to Plaintiff based on personal animus, which intensified after Plaintiff reported FC Resto's improper conduct and his misrepresenting himself as a supervisor to OEM management.

53.     On June 23, 2022, Marla Edmonson of Human Resources acknowledged receipt and forwarded the matter to the Department of Equal Opportunity ("DEO").  Despite this apt referral, the DEO merely opened a file yet failed to take any corrective or investigative action.

54.     Ultimately, Resto was censured for exceeding his limited authority as a Field Coordinator—whose role was strictly limited to relaying directives from management. Similar complaints had previously been raised by other Field Coordinators concerning Mr. Resto's micromanagement/mismanagement.

**IV.    <u>Failure to Accommodate Following Rushed EMSD Reorganization</u>**

*EMSD is Formed and Murillo Assumes Leadership*

55.     In August 2022, the Emergency Management and Services Department ("EMSD") was officially established through the merger of the NYCHA Office of Emergency Management ("OEM") and its Emergency Services Department ("ESD"). Defendant Rudy Murillo was appointed Acting Senior Director, and Anthony Luciano was appointed Deputy.

### *Management Denies Plaintiff Accommodation Request*

56.     Shortly after his appointment, Defendant Murillo unilaterally changed Plaintiff's, et al., work schedule to 4:00 p.m. to 12:00 a.m. Plaintiff immediately advised Murillo the new schedule would adversely affect his health and requested a transfer to a vacant daytime position in the new Flood Abatement unit in EMSD. Despite repeated verbal requests for a reasonable accommodation, including to Flood Abatement, Plaintiff was simply told to submit emails and medical documentation without being provided with meaningful guidance or procedural support.

57.     In August 2022, during a departmental meeting attended by management and his coworkers, Plaintiff publicly disclosed he was medically unable to drive at night due to ocular migraines and other health-related impairments. Plaintiff accordingly renewed his request for a reasonable accommodation.  EMSD Management failed to engage in the interactive process for assessing accommodation needs as required by law, both at that juncture and at any future opportunities for them to do so.

58.     During the same meeting, Defendant Murillo announced plans to hire an EMSD employee trainer.  Plaintiff, who had real relevant training and emergency response experience with the American Red Cross, expressed interest in this position and other vacant roles listed on the NYC Careers portal, including positions in the fledgling EMSD Flood Abatement unit, as Training & Exercise Coordinator, as Community Coordinator, and also as Borough Liaison, to accommodate him. Instead of even considering Plaintiff's qualifications, Murillo discouraged

Plaintiff's requests and questioned how he had learned of the available positions.  Co-worker Chancellor Gregg was hired as the Training & Exercise Coordinator in January of 2023.

59.     On or about August 17, 2022, Plaintiff received a "satisfactory" rating in his third quarterly performance evaluation. This favorable evaluation cast further doubt on the legitimacy of the prior negative evaluations Plaintiff had received, as it followed Plaintiffs rebuttal to HR.

60.     Throughout his employment, Plaintiff consistently performed his duties in a competent, professional manner. He introduced procedural improvements which remain in use within the department to this day and recorded possibly the highest number of emergency response entries of any OEM responder during the relevant period of his employment there.

61.     In or around August 2022, Manager Melody Torres was removed from remotely supervising Field Coordinators and replaced by Defendant Luciano.

62.     On August 18, 2022, Luciano announced a department-wide shift change, assigning all Field Coordinators to a 4:00 p.m. to 12:00 a.m. schedule. Plaintiff and coworker Kenneth Harley were paired together, with duties divided between driving and administrative or navigational support.  Both FC Harley and Plaintiff were semi-satisfied with this interim option.

63.     Pursuant to EMSD Standard Operating Procedure ("SOP"), night shift field inspections were to be conducted in two-person teams, both of whom were required to be in the same vehicle.  Effective August 21, 2022, Plaintiff's schedule was changed from 9:00 a.m.–5:00 p.m. (Monday through Friday) to 4:00 p.m.–12:00 a.m. (Sunday through Thursday), despite management's prior knowledge of his health conditions and their impact on his ability to drive safely at night.  No set protocol was put forth for when one team FC was RDO or absent, thereby necessitating the other one work solo during the assigned evening shift.

64.     On August 25, 2022, Defendant Luciano issued a department-wide email reiterating all field inspections were to be conducted in pairs, with one person driving and the other providing support. The inspections were reduced to monthly assignments across the five boroughs, along with duties such as uniform and supply deliveries typically performed by administrative staff ("Admins", or "Administrators").

### *Plaintiff's Medical Conditions and Impact on Major Life Activities*

65.     That same day, Plaintiff submitted a records request to his ophthalmologist at OCLI eyecare to obtain medical documentation confirming his diagnosis of ocular migraines in support of his planned reasonable accommodation request.

66.     Plaintiff has been diagnosed with multiple medical conditions, including ocular migraines, migraines, insomnia, depression, and anxiety. These conditions — both individually and collectively — substantially limit and/or perceived to limit one or more of Plaintiff's major life activities within the meaning of the Americans with Disabilities Act (ADAAA), the U.S. Rehabilitation Act, and applicable state and local disability laws.

67.     Plaintiff experienced daily symptoms of depression and anxiety, including a persistent low mood, excessive worry, difficulty concentrating and occasional trouble making decisions under chronic duress. Anxiety episodes and panic attacks occur occasionally, lasting anywhere from 5 to 15 minutes, triggered by external stress, fatigue, and physical exhaustion — which are normally triggered and made worse by late-night work hours and/or night driving.

68.     Plaintiff's stress-induced insomnia caused an ongoing difficulty falling asleep, frequent nighttime awakenings, and poor-quality, non-restorative sleep on many nights. As a result, Plaintiff suffered from constant nighttime drowsiness, decreased alertness, memory issues, and cognitive impairment, contributing to cumulative fatigue and making it unsafe to drive or

function effectively, predominantly at night due to his Circadian sleep rhythm being off kilter.

69.     In addition, Plaintiff experienced ocular migraines several times a month in both eyes. Each episode lasts approximately 15 to 40 minutes and causes severe visual disturbances, including rainbow-like colors and blurred vision. These episodes may create dangerous driving conditions at night and in low-light situations — circumstances inherent in Plaintiff's assigned 4:00 PM to 12:00 AM work shift. The unpredictable nature of these migraines posed a constant risk to Plaintiff's visual acuity, focus, and ability to perform tasks requiring both precision and attention.  Plaintiff had been formally diagnosed with these ocular migraines on July 29, 2019, following recurrent episodes of visual disturbance.

70.     Plaintiff also suffers from traditional migraines, typically lasting 1 to 2 hours per episode, often following or accompanying ocular migraines. These migraines caused an intense, throbbing pain behind the eyes, heightened sensitivity to artificial light and sound, and cognitive difficulties, further impairing Plaintiff's ability to focus and safely drive at night, specifically.

71.     The situation was made worse by ongoing road construction on the Van Wyck Expressway, which caused Plaintiff's commute home to take approximately two hours. As a result, Plaintiff frequently did not arrive home until after 2:00 AM, only to wake up at 6:00 AM regardless of when sleep began, compounding the cumulative fatigue plus mental and physical strain caused by these medical conditions.

72.     Despite the serious health risks posed by night driving, Plaintiff never refused assignments. To manage his condition, Plaintiff was often required to reduce his driving speed or occasionally pull over to recuperate for safety, whenever not scheduled with a driving partner.

**V.      Hostile Work Environment, Discrimination, and Retaliation Following Plaintiff's Request for Reasonable Accommodation**

*Plaintiff Requests Reasonable Accommodations*

73.     On September 8, 2022, at the conclusion of his shift, Plaintiff submitted a formal request for reasonable accommodations via email. This request was addressed to Defendants Murillo and Luciano, SSEU Local 371 Delegate John Lisbon, NYCHA Human Resources, and himself.

74.     In the request, Plaintiff explained that his assigned shift of 4:00 p.m. to 12:00 a.m. created a significant hardship due to his documented disabilities, including depression, anxiety, ocular migraines, and migraines. He advised that excessive night driving exacerbated his medical conditions, interfered with his sleep and mental health stability and transiting home from work. This was the first time Plaintiff disclosed to NYCHA he had chronic mental health conditions.

75.     Plaintiff further advised NYCHA he was under the care of an ophthalmologist, a primary care physician, and a mental health provider. He stated his valid supporting medical documentation could be promptly provided and requested either the reinstatement to his prior daytime shift or transfer to a department or intra-department operating during daytime hours.

76.     Plaintiff clarified in his request he was neither refusing to work nor being insubordinate but was instead seeking a reasonable accommodation because of his health conditions.

77.     Plaintiff requested to be afforded the same courtesies and accommodations that had been extended to co-workers, including FC Francisco Resto, FC Myra Miller, Emergency Management Planning Coordinator Chancellor Gregg, and Preparedness Outreach Coordinator Faye Peithman, by permitting him to work a daytime shift as they continued to do.

78.     On September 9, 2022, NYCHA's Human Resources Employee Relations division, where Defendants Marla Edmonson, Amanda Donohue, and Robin Yudkovitz were employed, acknowledged receipt of Plaintiff's accommodation processing package request.

79.     NYCHA's Employee Reasonable Accommodation Coordinator (ERAC) Sharda Shrestha and the Return-To-Office (RTO) unit responded by providing Plaintiff with an official NYCHA Reasonable Accommodation Request (RAR) form and clear instructions for submitting the required documentation. Murillo & Luciano were also copied on these RTO communications.

80.     At no point did the RTO unit advise Plaintiff to refrain from his reporting to work, nor enact any mechanisms to themselves place him on an unpaid leave. Plaintiff remained qualified to perform all essential functions of his position, with some workable and reasonable accommodation, with Plaintiff being willing and able to do so, and him stating such concisely.

81.     Despite submitting his formal accommodation request, Plaintiff was still required to drive at night on September 11, 2022. That evening, Plaintiff single-handedly closed out the Jacob Riis Houses arsenic water emergency, operating an EMSD ICRV Sprinter vehicle between Manhattan and Long Island City, despite his medical limitations and the pending accommodation request.  No other EMSD staff was available to assist, and closure was mandatory/pre-scheduled.

82.     Although Plaintiff was accompanied by another employee (Administrator) on the initial leg of the Riis Houses trip, he was compelled by necessity to drive the vehicle back alone. Plaintiff had never previously driven alone at night, to his recollection, prior to this assignment.

***Defendants Murillo and Luciano Discriminate and Retaliate by Forcing Plaintiff onto Involuntary, Unpaid Leave Without Providing Reasonable Accommodation***

83.     On September 12, 2022, Defendant Murillo issued an impromptu, pretextual "Counseling Memorandum" citing alleged performance deficiencies. The memo referenced matters Plaintiff had either completed as directed or was summarily instructed not to perform.

84.     This memorandum was used as a pretense to conduct an unannounced meeting with Plaintiff in a transparent conference room, strategically in front of numerous employees.

85.     During said meeting, Murillo verbally informed Plaintiff he was being placed on *"indeterminate [*unpaid*] medical leave."* This action was taken despite the fact that Plaintiff reiterated he remained ready, willing, and able to work with a temporary accommodation while awaiting a transfer to a new position and/or new department.  Murillo did not initiate a Section 72 referral, confirming he did not genuinely believe Plaintiff was medically unfit to perform the essential job functions.

86.     Murillo explicitly told Plaintiff he could no longer work at EMSD **because of** his accommodation request and ordered him to vacate the premises *"on the hour"* under threat security would be called to physically remove him (and under threat of implied potential arrest). Murillo and Luciano treated Plaintiff this way because of his disabilities or due to his perceived disabilities, specifically his mental health conditions and the stigma they associated with them.

87.     Plaintiff repeatedly requested written confirmation of the suspension (involuntary unpaid leave) but was denied such.  Instead, Murillo handed Plaintiff a blank, improperly copied and formatted partial RAR form (1 of normally 2 pages), ordering him to complete it and "*leave immediately*", even though Plaintiff had already received and had begun completing the official, properly made RAR form provided by RTO on September 9, to which management was cc'd.

88.     At no time during this meeting did Defendant Murillo engage in the interactive process as required under applicable laws to determine what duties Plaintiff could or could not perform or how he might be reasonably accommodated.  Defendant's Murillo and Luciano made no effort to explore any potential accommodations, blatantly refusing such, nor to engage in good faith dialogue regarding Plaintiff's potential limitations and ability or inability to work.

89.     Instead, Defendant Murillo focused solely on issuing Plaintiff a bogus counseling memorandum — a form of informal discipline intended to notify an employee of a performance

22

issue and provide an opportunity for improvement. This action was particularly unusual and so unwarranted given that Defendant Murillo was presently instructing Plaintiff to leave and not to return to the Long Island City worksite indefinitely.

### *Defendants Murillo and Luciano Escalate Discrimination and Retaliation with Intimidation and Forced Removal*

90.    Shortly after Plaintiff returned to his desk to finalize and submit his Reasonable Accommodation Request (RAR) to the RTO via his NYCHA email as is required, Defendant Luciano approached Plaintiff's workstation in an overly aggressive and threatening manner.

91.    Defendant Luciano repeatedly invaded Plaintiff's personal space by moving progressively closer to him in an aggressive and intimidating manner.  Defendant Luciano positioned himself so near to Plaintiff that he was able to clearly observe the unclasped work utility knife secured on Luciano's belt.

92.    In front of several Customer Contact Center (CCC) employees, Luciano verbally threatened Plaintiff, expressing frustration Plaintiff had not vacated the premises quickly enough, his voice and words becoming progressively louder and more threatening as he came closer.

93.    Defendant Luciano again adopted an aggressive posture and stated he would physically remove Plaintiff himself, stating: "*I'll get you out of here*".

94.    Plaintiff calmly but firmly responded he would not tolerate further intimidation or threats.  In response, Defendant Luciano instructed Administrator Anthony Elcock to *"call security and have them get rid of this guy."*  Elcock complied with the directive, and LIC lobby security was contacted from the Tank with orders to forcibly remove Plaintiff on pain of arrest.

95.    Throughout the encounter, Plaintiff remained calm, composed, and professional. He did not raise his voice, use threatening language, nor engage in any disruptive conduct.

96.     The incident was witnessed by more than a dozen employees, including FC Kenneth Harley, Administrators Willie Bailey and Anthony Elcock, CIRs Richard Washington and Stella (last name unknown), and CCC Supervisor Shiv Choythani, among several others.

97.     In an effort to de-escalate the situation, Plaintiff finalized and submitted his Reasonable Accommodation Request via official NYCHA email, understanding that an RAR from his personal email would be rejected.  He then used the restroom and clocked out early, pursuant to the directives of Defendants Murillo and Luciano, before exiting the Long Island City facility from the fourth floor via the emergency fire stairs/exit.

98.     As a direct result of the incident, Plaintiff suffered a panic attack in the restroom. This mental health episode stemmed from the humiliation, intimidation, and emotional distress inflicted by the Defendants' unprofessional conduct that night.

99.     Although Plaintiff ultimately avoided physical removal by security via exiting the LIC premises utilizing the fire stairs exit, the very plausible threat of such forced removal was profoundly traumatic.  It caused lasting harm to Plaintiff's emotional well-being, personal sense of safety, and so permanently defamed Plaintiff's professional dignity in the workplace, and at NYCHA citywide. Also it precluded Plaintiff from ever returning to Long Island City NYCHA.

100.    Prior to revealing his mental health disabilities, while employed within NYCHA's OEM department — a small unit consisting of approximately ten (10) employees — Plaintiff had previously experienced driving limitations due to possessing an out-of-state driver's license. At that time, he was promptly accommodated and exempted from driving duties without any issue.

101.    However, following the merger of OEM and ESD to form the EMSD department, which expanded to over 130 employees operating across both day and night shifts, management

claimed that no alternative duties were available for Plaintiff, only **after** his disclosure of mental disabilities, and stated he could not be accommodated in any manner, even concerning driving.

102.    During this period, Defendant Murillo was actively interviewing candidates for the NYCHA EMSD Resident and Emergency Preparedness Associate position — a role that Plaintiff was qualified for and could have performed on an interim basis while awaiting the approval of his reasonable accommodation.  The newly hired candidate began her employment in November 2022, approximately six to eight weeks after Plaintiff was placed on involuntary unpaid leave. She was also ultimately terminated.

103.    Plaintiff possessed relevant experience from his prior work with the American Red Cross, and this was a daytime position that worked in conjunction with Faye Peithman, with whom Plaintiff had previously participated in several NYCHA-development Family Day events.

104.    Despite this, Defendants failed to consider nor offer Plaintiff any other available opportunities which would have allowed him to remain gainfully employed while awaiting the potential approval of his reasonable accommodation.

### *Improper Interference with the Reasonable Accommodation Process*

105.    Despite RTO appropriately accepting Plaintiff's accommodation request under established NYCHA procedures, Defendants Murillo and Luciano still unnecessarily inserted themselves into the process by summoning Plaintiff for an impromptu meeting to expel him.

106.    Given that RTO had already communicated directly with Plaintiff and provided clear instructions for submitting his request, there was no legitimate or professional reason for Defendants Murillo and Luciano to intervene.  Yet still they did so knowingly and willfully.

107.    The bad conduct of Defendants Murillo and Luciano was clearly intended to intimidate, humiliate, and retaliate against Plaintiff for engaging in an allowed and protected

activity—specifically, after his disclosing his mental health disabilities and his accordingly requesting reasonable accommodations for such. Defendants Murillo and Luciano made no further contact with Plaintiff regarding his reasonable accommodation requests post-EMSD.

108.    By threatening Plaintiff with forced removal and contacting security, Defendants deliberately mischaracterized and perceived Plaintiff as a dangerous presence at his workplace, despite his calm and professional demeanor; purposely engaging in a blatant effort to agitate him into volatility to justify their perceptions/misconceptions of his alleged mental instability.

109.    Following the incident and Plaintiff's forced exit, FC Kenneth Harley texted Plaintiff, stating: "*Ok, I was making sure you were good" and "They arrived with security!"*

110.    That evening, Plaintiff informed coworker Myra Miller of the events. Miller subsequently contacted a former Local 371 delegate, Nancy, who escalated the matter to SSEU Local 371 President Anthony Wells.

### *Plaintiff' Submits Completed Reasonable Accommodation Request with Supporting Documentation*

111.    Plaintiff formally submitted a completed Reasonable Accommodation Request (RAR) form to NYCHA Human Resources Return-to-Office (RTO), accompanied by supporting medical documentation on September 12th, 2022; **after** being ordered to vacate his LIC worksite.

112.    Medical documentation submitted in support of his request included documents from his ophthalmologist confirming a diagnosis of ocular migraines and a letter from his mental health provider verifying treatment for depression, anxiety, and stress-related insomnia.

113.    In this detailed e-mail submission, Plaintiff reiterated his need for reasonable accommodations based on his documented history of ocular migraines, migraines, insomniac sleep disorders, depression, and anxiety. These conditions were either caused by and/or were exacerbated by the hostile, management-induced stressful hostile work environment at EMSD.

114.    As part of his RAR, Plaintiff specifically requested either reinstatement to his previous daytime shift or preferably a transfer to a department operating during daytime hours.

115.    Alternatively, Plaintiff proposed an interim accommodation plan which would allow him to remain in his EMSD active role while minimizing health risks. This plan included switching to the Sunday 8:00 a.m. to 4:00 p.m. shift, during which he would work alone, or via being paired with another EMSD Field Coordinator to handle evening driving responsibilities.

116.    Plaintiff further noted that from Tuesday through Thursday—when four Field Coordinators were regularly scheduled—he would ride with a coworker(s) to fulfill his duties. At the time, Plaintiff's regular schedule was Sunday through Thursday, 4:00 p.m. to 12:00 a.m., with Fridays and Saturdays as his rostered days off.  Notably, at least one of his coworkers was already scheduled to work those same days, including the Sunday morning day shift, thereby facilitating a workable accommodation arrangement.  Plaintiff articulated such to his supervisors.

117.    Plaintiff explicitly stated in his RAR there were no limitations preventing him from performing the essential duties of his role at EMSD, including monthly site inspections, delivery of supplies, administrative functions, and operating the "Tank" dispatch unit at LIC.

118.    Plaintiff could have continued working in Watch Command while awaiting a decision on his RAR, a position he had previously held on a full-time basis aside from special assignments.  Such an arrangement was both reasonable and consistent with past practices.

119.    Despite Plaintiff's clearly stated needs and reasonable proposals, Defendants strategically failed to engage in the legally mandated interactive process to explore any/all reasonable accommodation.  Instead, Defendants Murillo and Luciano refused to evaluate or implement any temporary measures and unilaterally simply placed Plaintiff on unpaid leave.

120.    Their actions, including falsely portraying night driving as a now essential job function and failing to participate in good faith via the mandated interactive process in assessing reasonable accommodations, reflected a deliberate strategy to remove Plaintiff from his position.

121.    On September 13, 2022, RTO requested additional documentation in support of Plaintiff's RAR, which Plaintiff timely provided.

### Availability of Reasonable Accommodations

122.    At the time of Plaintiff's reasonable accommodation request, daytime shifts were available within EMSD. This is evidenced by the work schedules of Field Coordinator Michael Rosendary, who worked from 8:00 a.m. to 4:00 p.m. on Saturdays; Field Coordinator Kenneth Harley, who worked from 8:00 a.m. to 4:00 p.m. on Sundays; and by Field Coordinator Myra Miller, who worked remotely from 9:00 a.m. to 5:00 p.m., Monday through Friday for months.

123.    In an attempt to justify their decision to remove Plaintiff from EMSD, Defendants falsely asserted in their EEOC position statement that "All Field Coordinators in the Response Unit worked from 4 p.m. to 12 a.m. and, contrary to Charging Party's belief, there was no daytime shift to which he could have been assigned in EMSD. *See id.* (requesting a transfer to another department "with daytime hours" or "be returned to [his] previous shift")."

## VI.    Plaintiff's Complaints Regarding Defendants Murillo and Luciano's Unlawful Conduct Fell on Deaf Ears as the Onslaught of Discriminatory and Retaliatory Conduct Continued

### Plaintiff Reported Defendants Murillo and Luciano's Discriminatory and Retaliatory Conduct to Human Resources

124.    On September 14, 2022, Plaintiff personally visited NYCHA's Human Resources (HR) office at 90 Church Street to seek clarification regarding the actual authority of Defendants Murillo and Luciano to place him on involuntary unpaid leave and to summon security without providing written explanation nor formal notice of the necessity of either such derogatory action.

28

125.    During this visit, Plaintiff first met with Steven Crawford, Secretary IV at HR, who initially appeared sympathetic to Plaintiff's concerns. Mr. Crawford generated an email to Marla Edmonson, et al., documenting Plaintiff's account of events and his valid concerns, and included HR Deputy Director Amanda Donohue in the correspondence as per standard policy.

126.    In this email, Mr. Crawford memorialized Plaintiff's contention that he had been confronted at his workstation by his supervisor, subjected to various threats, previously verbally threatened by Murillo while locked in the OEM Radio Room, and forcibly removed from the NYCHA Long Island City building by security actions.    Plaintiff also advised Mr. Crawford of his fears about being marked AWOL and his concern over possible retaliation following his disclosure of serious medical conditions, including vision impairment and anxiety/depression.

127.    Despite this formal notification and the involvement of senior HR personnel, no response, acknowledgment, or follow-up was **ever** issued regarding Plaintiff's complaints during several visits to NYCHA HR at 90 Church Street: nor from any NYCHA official accordingly.

### *NYCHA's Management's Failure to Intervene: Shrestha, Edmonson, Donohue and Yudkovitz Aided and Abetted in Discriminatory and Retaliatory Conduct*

128.    On that same day, Murillo approved and extended a remote work accommodation for another employee, FC Myra Miller, due to her physical disability. Murillo was notably also preparing to transfer her to a new duty position upon her eventual return to the LIC offices.

129.    On September 15, 2022, shortly after Plaintiff's forced workplace removal, Plaintiff's health insurance coverage was terminated. This termination occurred despite Plaintiff's Reasonable Accommodation Request ("RAR") having emphasized the critical importance of uninterrupted medical coverage, given his ongoing psychological and ocular treatments.

130.    In response to a request for additional documents from RTO, on September 19, 2022, Plaintiff submitted supplemental documentation from his treating psychologist, Dr. DeFazio. The letter confirmed Plaintiff's treatment for depression and anxiety since May 7, 2022, and explained how a sleep disorder had exacerbated these conditions, contributing to lateness and absenteeism. Dr. DeFazio specifically recommended a daytime work schedule as a reasonable accommodation.

131.    Plaintiff also duly notified RTO that, following his accommodation request, Defendants Murillo and Luciano retaliated against him. He remained uncertain about his employment status after being informed he could not return to EMSD, sans formal notice or documentation. EMSD management had arbitrarily placed him on unpaid leave, bypassing Human Resources, and offered no written explanation for this malfeasant and adverse action.

132.    Plaintiff further disclosed how Defendant Luciano had physically and verbally intimidated him, while Defendant Murillo ordered him to clock out and invoked a facetious "indeterminate medical leave", and undue MH perceptions to justify involving building security.

133.    Citing the unsafe and hostile work environment created by these retaliatory actions, Plaintiff advised RTO it might not be feasible for him to safely return to EMSD. He included a copy of his résumé along with job postings of every then-available Community Coordinator position at NYCHA for which he met the minimum qualifications, and formally requested a transfer to one of those vacant positions, or something similar per his experience.

134.    Despite submitting complete medical documentation and all required materials, RTO - located on the same floor as NYCHA's Human Resources – failed to respond.  Plaintiff was left in limbo as to status/duration of his impermissible, involuntary, indefinite unpaid leave.

135.    At no point did NYCHA or its representatives engage in any interactive process with Plaintiff to determine whether he could continue working under an appropriate reasonable accommodation. Rather than acting in good faith or in compliance with the law, Defendants collectively fostered and allowed discriminatory and retaliatory conduct to continue unabated.

### *Plaintiff's Continued Efforts to Resolve His Employment Status and Obtain a Reasonable Accommodation are Ignored*

136.    On or about September 21, 2022, Plaintiff participated in a Zoom meeting with his union 'representatives', including Yoselis De La Cruz, Amerigo Santiago, John Lisbon, and Maikudi Okure. During this meeting, Maikudi admitted the union had misplaced Plaintiff's prior complaints regarding two improper performance evaluations, undermining Plaintiff's confidence in union representation, having potentially exposed Plaintiff's complaints to EMSD management

137.    On September 23, 2022, Plaintiff checked the City of New York/NYCHA CHRMS system to assess his employment status. The system reflected that he was *"Active from 11/18/2021 – 9/15/2022,"* but as of September 16, 2022, he had been placed on *"Other Leave Without Pay"* through the indefinite, system generated date of '*December 31, 9999*'.

138.    That same day, Plaintiff received notice from COBRA that his health insurance had officially ended as of September 15, 2022, due to *a "qualifying event"* on September 16. To continue coverage, he would be required to pay $919.07 per month—an insurmountable and non-quantified expense given his unpaid status. No such letter was issued after his termination.

139.    On September 26, 2022, Plaintiff returned in person to HR at 90 Church Street, again contacting RTO's Ms. Shrestha while waiting. Despite advising RTO of the ongoing harm caused by his inability to return to work, he was denied any updates regarding status of his RAR.

140.    His next in-person meeting with Mr. Crawford yielded no further answers either. Plaintiff was merely told Defendant Edmonson would contact him at 9:00 a.m. on September 27. No such call occurred.

141.    Plaintiff's attempts to follow up with Defendant Edmonson were met with deliberate delays, including being placed on hold for over 30 minutes, transferred without resolution, or promised return calls that never materialized. This scenario repeated itself ad nauseam over the course of several days, to the point where Plaintiff directed any future communications to/with HR via writing and/or email to memorialize his contact attempts.

142.    Between September 14 and September 28, 2022, Plaintiff made at least 14 phone calls to Human Resources, including to Defendant Yudkovitz's office, without success.

143.    By September 28, 2022, Plaintiff had been on suspension (involuntary unpaid leave) for 15 consecutive days without receiving any formal communication from NYCHA regarding his job status or the retaliation he had reported. Despite two in-person visits and multiple calls, no substantive/written response was ever provided, even as of this court filing.

144.    That same day, Plaintiff submitted a written request to RTO, seeking expedited processing of his RAR. In this correspondence, Plaintiff reiterated that Defendants Murillo and Luciano retaliated against him by unlawfully placing him on unpaid leave, resulting in financial hardship, emotional distress, and loss of medical coverage. Plaintiff stressed how the absence of income had made it impossible for him to pay rent, seek treatment for his physical and mental health conditions, or maintain any measure of financial security. Yet, RTO failed to respond.

145.    On September 30, 2022, Plaintiff emailed Defendant Robin Yudkovitz, then NYCHA's Director of Human Resources and an attorney, requesting clarification regarding his employment status and the policy or authority relied upon by Defendants Murillo and Luciano to

32

place him on unpaid leave. Plaintiff copied Steven Crawford and Amanda Donohue. He reported being absent for 17 days without receiving any formal documentation or explanation and had formally requested copies of any relevant NYCHA policies and procedures authorizing such an action.

146.    Plaintiff provided Defendant Yudkovitz with a detailed account of the events that occurred on September 12, 2022, involving Plaintiff and Defendants Murillo and Luciano. In addition, Plaintiff referenced his prior visits to the Human Resources office and his interaction with Steven Crawford on September 14, 2022. Plaintiff also attached a copy of the sent email authored by Crawford, which memorialized and documented the events of said mortal contact.

147.    Plaintiff stressed to Defendant Yudkovitz he had never behaved in a belligerent or insubordinate manner and had never refused to work. His sole request had simply been for the processing of his reasonable accommodation. He further noted he had made two in-person visits to the Human Resources office and had attempted multiple times to contact Marla Edmonson, all without any resolution. He reiterated he had never voluntarily requested leave and had received no formal written notice of his actual employment status post-09/12/22, nor official follow ups.

148.    Plaintiff further advised Defendant Yudkovitz that being placed on involuntary leave and deprived of wages had caused him severe financial hardship, marked deterioration of his physical health, derailment of his credit and a measurable decline in his mental well-being.

149.    As a result of his unauthorized and involuntary removal from the workplace, Plaintiff lost the accrual of his leave time on or about October 1, 2022.

150.    By October 4, 2022, Plaintiff had been kept from work for twenty-two (22) consecutive days without formal notice or explanation. On that date, Defendant Yudkovitz finally responded via email, claiming Plaintiff was *"not on a medical leave"* and advising if he

could not report to work, he would need to submit a leave request. At no point did Defendant Yudkovitz address why Plaintiff had been summarily removed from the workplace, placed in unpaid status, or denied the ability to work.  Plaintiff has yet to receive a written leave summary.

151.    Also on October 4, 2022, Defendant Yudkovitz scheduled a meeting for Plaintiff with Kimberly Taylor, Director of Public Housing Tenancy Operations ("PHTO"), to discuss a possible reassignment to a supposed "Community Coordinator" role.

152.    During the meeting, Ms. Taylor advised Plaintiff that work-related equipment, including a mobile phone, MiFi device, and laptop, and also propriety software access would be provided as necessary tools to conduct his work. None of the above was ever provided Plaintiff.

153.    Plaintiff's reasonable accommodation request and some of his mental health/ocular disabilities were discussed with Director Taylor, who informed Plaintiff that he did not need to be concerned about driving responsibilities, as the department did not have a vehicle available. Defendant Yudkovitz also conveyed the same information to Plaintiff. Taylor requested Plaintiff "return any vehicle key fobs" to the NYCHA motor pool.

154.    On October 11, 2022, Plaintiff sent a follow-up email to NYCHA's Reasonable Accommodation Unit (RTO), requesting an update on his pending accommodation request. In said message, he reiterated he had been subjected to retaliatory and adverse employment actions in direct response to submitting his accommodation. RTO yet again failed to respond in kind.

155.    On October 12, 2022, Plaintiff sent another email to Defendant Yudkovitz of HR, formally requesting clarification of his employment status and inquiring who had authorized his placement on indefinite unpaid leave. He again raised serious concerns regarding the blatant discriminatory and retaliatory conduct he had endured and stated the involuntary unpaid leave constituted an unlawful suspension in direct retaliation for his legitimate accommodation request.

34

156.    Plaintiff expressed his belief that Defendant Yudkovitz was complicit in these violations by refusing to provide any logical explanations or signed documentation regarding his employment status for nearly one month, and his suspicions she herself had signed off on such.

157.    Plaintiff also informed Defendant Yudkovitz he had never requested or consented to a leave of absence. He noted his Union Representative, Amerigo Santiago, had informed him that Defendant Yudkovitz had approved a leave on his behalf without his consent or knowledge.

158.    Plaintiff explained he had exhausted his financial resources, and could not afford food, transportation, or medical care, and was no longer able to visit his doctors. His most recent paycheck was in the amount of $22. He again emphasized the retaliatory actions and unlawful suspension were exacerbating his depression and anxiety and causing him serious real-time and potentially long-term harm.

159.    On October 14, 2022, Defendant Yudkovitz replied, asserting Plaintiff had not been placed on an *"HR-approved Leave of Absence ("LOA"),* or *"furloughed."* She stated that because he had not 'reported' to work since September 13, 2022, his accrued leave balances were exhausted, resulting in his unpaid status. She acknowledged this status led to cancellation of his health benefits. Yudkovitz would not, however, expound on leave type or its reasoning.

160.    Despite Plaintiff's consistent assertions he never requested any leave and wished to continue working with accommodations, Defendant Yudkovitz merely provided an email address where he could request a leave. Plaintiff was at that time ineligible for FMLA due to the length of his employment, and logistically unable to even apply for any official "leave" status.

161.    At the time Plaintiff was forced onto unpaid status, he had approximately two (2) days of accrued sick leave available.

162.    On October 14, 2022, Yudkovitz informed Plaintiff of his transfer to the PHTO Department and directed him to report to 250 Broadway, 10th Floor, New York, on October 17, 2022, to begin a new assignment under Director Kimberly Taylor, thereby officially facilitating Plaintiff's unnecessarily being transferred solely because of his actual or perceived disabilities. NYCHA HR confirmed said reassignment and reporting schedule in a separate communication.

163.    In total, Defendants Murillo and Luciano unlawfully and unilaterally placed Plaintiff on involuntary unpaid leave, effectively suspending him, for a total of thirty-four (34) days without due process. They compelled Plaintiff to exhaust all of his accrued leave balances without lawful justification, prohibiting him from working, despite his willingness and actual capability to do so, and did such solely in retaliation for his submission of a legitimate, timely, documented Reasonable Accommodation Request and Plaintiff's actual/perceived disabilities, specifically his self-involving mental illness.

164.    Unbeknownst to Plaintiff at the time, he had been improperly coded in NYCHA's internal system as *"Personal Without Pay"* for the period from September 15, 2022, through October 13, 2022. Plaintiff never requested, applied for, nor consented to any form of personal leave—paid or unpaid— at any time. Plaintiff signed off on no such leave documentation, ever.

165.    Plaintiff made multiple good faith attempts to contact Defendant Robin Yudkovitz—on at least four separate occasions—to obtain clarity regarding his sudden and unexplained placement on unpaid leave, which immediately and blatantly followed his lawful request for reasonable accommodations due to his disabilities and/or perceived disabilities.

166.    Plaintiff persistently inquired why he had been removed from his workplace, subjected to humiliation and threats, denied compensation and benefits, and also why he was effectively suspended without due process or explanation. This was officially, as an employee.

36

167.    Despite these repeated efforts, Defendant Yudkovitz, acting in her capacity as both NYCHA's Human Resources Director and a licensed attorney, knowingly failed to provide any rationale nor justification of leave, thereby abdicating her legal and ethical responsibilities.

### Defendants Systematic Failure to Engage in the Interactive Process for Reasonable Accommodation Requests

168.    Yudkovitz admitted NYCHA routinely failed to engage in lawful interactive process.  Specifically, she testified she did not communicate directly with employees seeking accommodations, nor did she afford them an opportunity to contest or clarify management's representations regarding their job duties or improper conduct before a decision was made.

169.    Instead, Yudkovitz acknowledged relying solely on any information provided by the employee's supervisor. She admitted: *"We referred only to what the supervisor told us,"* and confirmed she did not review official DCAS job specifications, duty statements, or job postings, nor valid employee input when assessing reasonable accommodation requests.

170.    Moreover, although supervisors lacked authority to unilaterally modify job duties, Yudkovitz testified she deferred entirely to their descriptions without oversight nor verification. When asked whether she independently reviewed job duties, she responded: "*The best way to find out what his duties and responsibilities are would be to speak with his supervisor*," thereby allowing unverified supervisory accounts to dictate outcomes normally quantified by HR/DCAS.

171.    Prior to Yudkovitz's role at NYCHA and the above court testimonies in a recent case, she served as the Senior Counsel for Labor and Employment at the Philadelphia Housing Authority, where she handled employment discrimination claims, labor disputes, EEOC matters and general workplace law compliance.

172.    Plaintiff proposed several suggestions for a temporary reasonable accommodation within his RAR that would have allowed him to continue working while his requested permanent

accommodation was under review. However, Defendants Yudkovitz and Shrestha failed to even engage in the interactive process or make any efforts whatsoever to explore these options to keep Plaintiff on active payroll and performing his duties for the good of NYCHA and its residents.

### *Human Resources Failed to Report the EEO-Related Complaints to DEO Failure to Investigate Discrimination and Retaliation Reports*

173.    Plaintiff has direct knowledge of NYCHA's hiring procedures, its supervisory training, and internal complaint protocols based on sworn deposition testimony from Nicole Van Gendt, NYCHA's Senior Vice President of Human Resources, also in a separate legal matter. Van Gendt testified that Human Resources oversees reasonable accommodation requests, while the Department of Equal Opportunity ("DEO") plays a limited, consultative role. She further stated that NYCHA supervisors are primarily trained through electronic resources, with full procedural guidelines readily accessible to staff.

174.    Van Gendt also confirmed that EEO-related complaints are typically submitted to Human Resources and referred to the DEO, and all employment actions—including discipline, suspension, and termination—are coordinated with the EEO Office. Despite these established procedures, Plaintiff's reports of discrimination and retaliation were not properly investigated or addressed.

## VII.    Plaintiff Continued to Suffer Retaliation, Disparate Treatment, and a Hostile Work Environment Following Transfer to PHTO, Aided and Abetted by Defendant Yudkovitz

175.    Upon Plaintiff's reassignment to the new Public Housing Tenancy Operations ("PHTO") department, he was still designated as a Community Coordinator. According to NYC Careers, the responsibilities associated with PHTO roles involved clerical duties and resident outreach tasks related only to PACT/RAD conversions, policy recommendations, and PM site program oversight. These clerical responsibilities bore no relation to Plaintiff's prior roles in emergency management, nor were they staff-centered in nature or supervisory in nature at all.

*Defendants' Knowledge of Plaintiff's Mental Disabilities and Accommodation Status*

176.    Pursuant to NYCHA's Standard Procedure Manual, Human Resources ("HR") is tasked with notifying supervisors of any work restrictions or accommodations. As a result, Defendants Kimberly Taylor, LaToya Ramseur-Deliotte, and Carolyn Gibbs were fully aware Plaintiff had been 'granted' a reasonable accommodation due to his diagnosed mental health conditions, including depression, insomnia and anxiety; as well as for working daytime hours.

177.    On or about October 17, 2022—Plaintiff's first day at the PHTO office located at 250 Broadway, Manhattan—he made an inquiry about his time and leave accruals, directing the question to Defendants Taylor, Ramseur-Deliotte, and Gibbs. He was later informed by NYCHA Secretary III Vivian Gill that **no** leave time was credited to his NYCERS account prior to PHTO.

178.    That same day, Plaintiff contacted EmblemHealth and also reviewed his current NYCAPS records, discovering his health insurance had not been reinstated. He immediately reached out to NYCHA's Health Benefits Unit in an effort to resolve the issue.

*Retaliatory and Discriminatory Conduct by Defendants Following Plaintiff's Transfer to PHTO Due to Actual/Perceived Mental Disabilities*

179.    On or about October 19, 2022, Plaintiff was abruptly reassigned to the Park Rock Rehab/Consolidated Houses property management office, located at 575 Howard Avenue, Brooklyn, NY 11212, under the ostensible reason of undergoing *"training."*

180.    After again requesting information regarding his leave accruals, Plaintiff was summoned to a virtual meeting with Defendants Taylor, Ramseur-Deliotte, and Gibbs, with this meeting purportedly to *"discuss the HR Manual"* as opposed to discussing his leave accruals.

181.    Following the meeting, Defendant Taylor emailed Plaintiff a list of four specific HR Manual sections she claimed they would review in a future Teams meeting: (1) Alcohol and Substance Abuse, (2) the Employee Assistance Program ("EAP"), (3) Equal Employment

Opportunity ("EEO"), and (4) Workplace Violence. None of these four topics were germane to Plaintiff's job functions, probationary status, work history nor his leave inquiries. Taylor's email stated: *"I highlighted certain topics and identified the pages below. We will review them during a Teams Meeting."*

182.    On or about October 24, 2022, Plaintiff emailed HR Director Robin Yudkovitz seeking clarification regarding his employment status, including the type of leave to which he had been subjected, the identity of the individual who authorized it, and who was responsible for terminating his health benefits.

183.    Plaintiff reiterated he was experiencing undue retaliation and discrimination, and requested permission to retrieve his personal belongings from EMSD in Long Island City. He also sought confirmation regarding whether Defendants Murillo and Luciano had been officially disciplined for their unprofessional, derogatory, injurious and threatening conduct towards him.

184.    Plaintiff further expressed to Defendant Yudkovitz she had consistently refused to respond to his inquiries regarding these adverse actions, and he advised her that while she may choose to remain silent, NYCHA would ultimately be required to disclose all such relevant information in potential legal proceedings. At this time, Plaintiff was actively considering filing a formal complaint with the U.S. Equal Employment Opportunity Commission ("EEOC").

185.    On October 25, 2022, Plaintiff inadvertently discovered—via an internal email copied to him from Secretary Gill to payroll staff—that he had previously been placed on unpaid **suspension** by Defendants Murillo and Luciano as a direct result of his requesting a reasonable accommodation. The email read: *"Revised and resubmitted for correct suspension begin date. Action required."* Plaintiff had received no prior notification of any such suspension. Gill had no independent knowledge of Plaintiff's situation and was merely relaying information observed in

NYCHA's employee records system.

186.    Adding to the confusion and administrative irregularities, Secretary Gill disclosed Plaintiff was not listed as an active employee in NYCHA's system until after October 24, 2022 — and even then, only in a *"partially active"* status as a 'returning employee'.

187.    Plaintiff's health insurance was then not fully, but only partially reinstated on October 26, 2022, leaving him without proper health coverage for approximately six weeks.

188.    Two days later, on October 28, 2022, Defendant Yudkovitz finally acknowledged via email that Plaintiff was: *"not on a Human Resources Leave of Absence,"* thereby conceding Defendants Murillo and Luciano had improperly placed him on unpaid leave both because he requested a reasonable accommodation and also due to his actual and/or perceived disabilities.

### *Targeted and Stigmatizing HR Manual Reviews and Hostile Communications*

189.    Attempting to justify their actions, Yudkovitz cited Plaintiff's earlier communication about his possible inability to drive at night, stating:

> "In your September 8, 2022 email to your supervisors, you stated that you were "unable to **continue** driving at night without endangering [yourself] and others." Because driving at night was an essential function of your job, and, by your own statements, you were unable to perform that essential function, you were **advised** to use annual leave while your request for a reasonable accommodation ("RAR") was **reviewed**. You were not "placed" on leave, but by the nature of your inability to perform the essential functions of your job, your annual leave balance was charged accordingly."

190.    However, Plaintiff never consented to nor initiated a formal leave request. He was involuntarily placed on unpaid leave without notice, due process, or the opportunity to contest the decision.  Ms. Yudkovitz's statement demonstrates that Plaintiff was subjected to retaliation for engaging in protected activity, as she was fully aware driving was not an essential function.

191.    Yudkovitz further asserted Plaintiff's reassignment to PHTO was a reasonable accommodation *"not a promotion."*; failing to acknowledge it was a de facto demotion instead.

192.     When Plaintiff asked to retrieve his personal belongings from the Long Island City office, Yudkovitz imposed an unwarranted restriction in requiring both Manhattan and LIC security personnel to accompany him, further outlining how Plaintiff was perceived. She stated:

> "If you want to arrange a time to go to NYCHA's Long Island City location to retrieve your personal items, we can arrange for a time for someone from NYCHA's Office of Safety and Security to accompany you to do so."

This unjustifiably stigmatized Plaintiff as a potential security risk.  His personal items were lost.

193.     On the same day, Director Taylor again emailed Plaintiff, reiterating the prior highlighted sections of the HR Manual, particularly EAP and EEO.  She instructed Plaintiff to review the material and contact her with any questions.

194.     Plaintiff expressed concern over the inappropriate and stigmatizing focus of these highlighted topics, which bore no relevance to his role or performance. When he asked Taylor whether she had received derogatory information from HR Director Yudkovitz, Director Taylor confirmed she had "communicated" with Defendant Yudkovitz but offered no further details.

195.     When Plaintiff asked why the Workplace Violence section had been highlighted, Taylor responded flippantly: *"Don't you want to work in a safe environment?"* a baseless remark implying, without justification, that Plaintiff was posing an ongoing threat to parties unknown.

196.     Similarly, when Plaintiff raised concerns about the inclusion of the Alcohol and Substance Abuse section with Defendant Gibbs, she laughed and stated that she too: *"wondered why it was highlighted."* Plaintiff informed her these policies were inapplicable to him in toto.

197.     Finally, when Plaintiff asked PHTO Community Associate Ms. Candice Edwards whether she had undergone a similar meeting or received those highlighted HR Manual sections, Ms. Edwards denied ever being subjected to such treatment, even when provisional.

198.    On October 31, 2022, Defendant Taylor sent another email to Plaintiff, reiterating key topics from the HR Manual, advising him to reach out with any questions. The email read:

"I hope all is well. On Friday, October 28, 2022, a Teams Meeting was held to review the HR Manual with you. Ms. Gibbs and Ms. Ramseur were in attendance. We reviewed all the highlights below. You were instructed to review the HR Manual in its entirety. Feel free to contact us if you have any questions".

199.    Plaintiff perceived this communication as continued harassment and also as a reinforcement of the discriminatory stigma surrounding his mental health disabilities, while inappropriately suggesting he was a potential threat to other employees working at NYCHA.

200.    Although the NYCHA Employee Assistance Program (EAP) offers voluntary counseling services to employees managing issues such as alcohol and substance abuse, stress, anxiety, depression, personal, family or job difficulties and a few other issues, Plaintiff had never been cited for nor been associated with any workplace misconduct, violence, or substance abuse.

201.    Nevertheless, he observed the stigma related to his mental disabilities had clearly followed him to his new placement at PHTO. The undue disclosure of his mental health history to PHTO management by HR obviously triggered further discriminatory and retaliatory actions. Among these was a burdensome requirement imposed solely on Plaintiff by Defendant Taylor, who instructed him unnecessarily to email her each morning to "check in" upon his arrival at his worksites. This requirement was not enforced upon any similarly situated PHTO employees.

202.    Management's actions were unusual and unnecessary because Plaintiff was not a new employee, but had been employed by NYCHA for eleven (11) months, prior to simply being reassigned. Upon his being hired, Plaintiff completed all of the mandatory core DCAS trainings; including EEO, Diversity and Inclusion, Conflicts of Interest, and related courses required for all city employees and was very careful during his tenure to comply with the above proper practices.

***Defendants Falsely Claimed No Daytime Positions Were Available in Order to Force Plaintiff Out of EMSD***

203.    By November 1, 2022, Plaintiff's leave accruals were fully depleted as a direct result of Defendants Murillo and Luciano's decision to place him on unsubstantiated leave.

204.    After enduring significant financial hardship, Plaintiff finally received a truncated paycheck on November 3, 2022.

205.    Contrary to NYCHA's false assertion of daytime operations being phased out at EMSD, in November 2022, NYCHA hired Kimberly Tyre as a permanent daytime Resident and Emergency Preparedness Associate, thereby demonstrating such daytime positions continued to be filled/available. Plaintiff was more than qualified and experienced to hold the above position.

206.    Furthermore, on November 4, 2022, Defendant Murillo posted four daytime Borough Liaison job listings on NYC Careers and other platforms—only a scant two weeks after Plaintiff was 'transferred' to PHTO post-involuntary unpaid leave. Again, Plaintiff was qualified.

***Defendant Yudkovitz Continues Aiding and Abetting Discrimination and Retaliation***

207.    On November 14, 2022, Plaintiff emailed Defendant Yudkovitz, detailing the ongoing retaliation by HR and other NYCHA employees, seeking to preserve his legal rights. He requested a cogent explanation regarding his placement on unpaid leave and the LIC facility ban.

208.    Plaintiff included documentation disproving HR's assertion that nighttime driving was essential to his former position, submitting the original job description which characterized driving as merely a *"preferred skill."* He also demonstrated he had worked in tandem with other employees and had previously received accommodations for five to six months without his then possessing a valid New York State driver's license.

209.    Additionally, Plaintiff questioned why he was now to be escorted to retrieve his personal belongings from LIC, a clear signal NYCHA continued to stigmatize him as dangerous

solely due to his mental health diagnosis. Plaintiff formally complained to Defendant Yudkovitz, reporting a hostile work environment, disability-based discrimination, and retaliation. He also requested a formal update on his former employment status during the involuntary unpaid leave.

210.    Despite following up repeatedly from September through mid-November 2022, Plaintiff's concerns were ignored, and Defendant Yudkovitz failed to timely escalate the matter to NYCHA's Department of Equal Opportunity (DEO), constituting gross negligence in several ways and junctures per the handling of Plaintiff's clear and concise, fully legitimate complaints.

211.    On November 15, 2022, Plaintiff informed his supervisor, Carolyn Gibbs, that he needed to leave work early for a doctor's appointment. She immediately denied his request, citing Plaintiff's alleged *"poor time and attendance"* as false justification for denying treatment.

212.    On the following day, Defendant Yudkovitz finally responded back with a brief statement: *"Please be advised that your email has been forwarded to NYCHA's Department for Equal Opportunity."* This belated response came only after significant pressure and over a month and a half of her purposeful evasion.

### Plaintiff Subjected to Further Retaliation and Hostility by Supervisors at PHTO

213.    Also on November 16, 2022, Defendant Gibbs emailed Plaintiff stating she would be in the field the next day and instructed him:

> *"*Please use the Smart TV in the staff room to complete your daily assignment and check your emails. If the Smart TV is unavailable, please inform Mr. Gamble/Ms. Dennis for further assistance".

214.    Although reassigned to Park Rock specifically for 'training' purposes, Plaintiff received inadequate and sparse training from Defendant Gibbs and was never provided essential equipment; including a desk, computer, cell phone, use of propriety NYCHA software or a MiFi device. Training on and use of Seibel and AS400 were necessary to train fully for the position.

215.    Despite repeated requests, Plaintiff was never trained on core NYCHA systems such as the Siebel System and AS400. These platforms are critical to the daily operations of property management, particularly for processing residents' Public Housing Affidavit of Income (AOI) submissions and rent calculations. NYCHA typically provides employees with structured classroom training, online modules, manuals, and technical support for these propriety systems.

216.    Plaintiff was shuffled between various locations and often forced to share staff room computers for "training"; which were outdated and had limited functionality, impeding his ability to solidly learn to perform his job duties and carry out his job.  He encountered messages such as *"low disk space," "installation failed,"* and *"time to upgrade your browser—disk full,"* which he was unable to resolve due to lacking administrative IT access and facilitative working conditions.

217.    Candice Edwards, a coworker at Park Rock, attempted to support Plaintiff while juggling her own responsibilities. When Plaintiff questioned why he was performing Community Associate duties instead of Community Coordinator responsibilities, several PHTO management (Taylor, Ramseur-Deliotte and Gibbs) became visibly irritated and would not quantify such.

218.    On November 17, 2022, Plaintiff was reassigned yet again—this time to Fulton Houses, located at 421 W. 17th Street, New York, NY 10011—marking his third reassignment within one month.

219.    On November 21, 2022, Plaintiff learned he would now also be assigned several days per week to a Bronx location, his fourth worksite in just over a month. This assignment had not been disclosed to him prior to accepting the role. The Bronx commute required four hours of travel each day, despite Plaintiff having been informed his primary work location would be 250 Broadway in Manhattan—a site where he had only spent less than a day and a half  at since

beginning the PHTO role.

220.    When Plaintiff raised concerns about his unreasonable assignments and travel requirements to Defendant Taylor, she dismissively responded: *"I don't care."* Her open hostility was evident; she had not requested Plaintiff's placement in her department and now seemingly resented HR's decision to assign him there, and maintained a condescending tone.

221.    On or about November 23, 2022, Plaintiff contacted DEO to confirm whether Defendant Yudkovitz had ever filed an official complaint on his behalf. The DEO Director herself informed him personally that no such complaints had been submitted nor kept on file.

222.    Plaintiff followed up again on or about November 25, 2022, and received the same confirmation: Defendant Yudkovitz had failed to submit any complaint; verbally, by email or otherwise.

223.    On November 28, 2022, Plaintiff began working at Fulton Houses.  He was immediately improperly issued a disciplinary write-up for allegedly clocking in late. Plaintiff explained his delay was caused by NYPD activity related to a homicide which had occurred directly across the street from the PM office just scant hours before his scheduled start time.

224.    The New York Police Department had established an active crime scene, by cordoning off the area and preventing Plaintiff from crossing the police line to reach the unfamiliar worksite. In addition, Plaintiff had not been provided with clear reporting instructions. The homicide and resulting police activity were widely reported by local media outlets, yet management failed to account for these extenuating circumstances, even when notified of it.

225.    Defendants Taylor and Ramseur-Deliotte were stationed at NYCHA's central office at 250 Broadway, while Ms. Gibbs worked at Park Rock Consolidated in Brooklyn—

and were not stationed at Fulton Houses or any of Plaintiff's other proposed worksites. As a result, they were disconnected from the day-to-day conditions and operational challenges at those locations, thereby rendering their disciplinary actions uninformed, retaliatory and arbitrary.

226.    On November 28, 2022, Plaintiff commenced work at the Fulton Houses property Management (PM) office in Chelsea, Manhattan—his first actual work assignment following his transfer to the Public Housing Tenancy Operations department.  Prior to such, Plaintiff was only placed at Park Rock for *"training,"* during which no actual casework nor files were assigned.

227.    Plaintiff's reassignment to the PHTO department did not constitute a legitimate reasonable accommodation, but rather served as a pretext for seemingly orchestrated ongoing retaliation and disability-based discrimination. Plaintiff had voiced concerns of being "set up".

## VIII.  Plaintiff's Protected Activity Resulted in Escalating Retaliation and Discriminatory Conduct Culminating in His Unlawful Termination

### *Plaintiff's Attempt to Seek Redress Through NYCHA's Department of Equal Opportunity*

228.    On or about December 5, 2022, Plaintiff contacted NYCHA's Dept. of Equal Opportunity (DEO) to inquire whether Defendant R. Yudkovitz had filed an official complaint on his behalf, alleging disability discrimination and retaliation by both Murillo and Luciano.

229.    Plaintiff was informed by the DEO's lead attorney that no formal complaint had been filed. Rather, Defendant Yudkovitz had merely engaged in an informal, non-committal telephone conversation with DEO, and the DEO attorney stated she had intended to "eventually follow-up" with Plaintiff to determine whether he wished to file a formal complaint.

230.    During this conversation, Plaintiff again officially informed DEO he continued to experience a hostile work environment characterized by discrimination and retaliation, primarily at the hands of Defendants Taylor, Ramseur-Deliotte, and Gibbs.

231. Plaintiff reported being denied the essential training and resources necessary to fulfill his job duties, which he reasonably believed was due to his mental health disabilities and his protected activity in requesting reasonable accommodations. Plaintiff further explained he was being subjected to disparate treatment, including excessive micromanagement and also systematically being held to a different standard than similarly situated and/or lower ranking colleagues.

232. Plaintiff asked whether filing a complaint with DEO would bar him from filing a charge with the EEOC. The DEO attorney responded that while it would not preclude EEOC involvement, it would effectively make Plaintiff *"an adversary of NYCHA."*

233. Plaintiff reasonably interpreted this statement as DEO's attempt to discourage the filing of external complaints and maintain internal control over discrimination allegations. Given Defendant Yudkovitz—a participant in the discrimination and retaliation—had communicated with DEO, Plaintiff reasonably concluded the DEO's internal process lacked any impartiality. Accordingly, he declined to pursue a DEO complaint and informed the DEO attorney he intended to proceed directly with EEOC. At Plaintiff's request, DEO closed its so-called 'file'.

### *Ongoing Discrimination and Retaliation Following Plaintiff's Protected Activity*

234. In early December 2022, Plaintiff began experiencing repeated issues accessing his NYCHA email account. These problems persisted for almost 2 weeks. Despite reporting these issues to Defendants Taylor, Ramseur-Deliotte, and Gibbs on multiple occasions, no assistance was provided. Plaintiff was compelled to contact NYCHA's IT Department.

235. On December 14, 2022, during a Microsoft Teams meeting and via email, Plaintiff was informed that beginning the week of December 19, 2022, he would be reassigned to Union Avenue Consolidated, located at 881 Rev James A Polite Avenue, Bronx, NY 10459, two days per week, with a daily quota of fifteen files.

236.    Plaintiff was further directed to also report to Fulton Houses in Manhattan on Mondays, Wednesdays, and Fridays. Plaintiff raised concerns about the unreasonable commute, which exceeded four hours round-trip daily, and reiterated he remained untrained, and lacking software access, and therefore unprepared to perform his duties effectively. In response to his inquiry regarding the identity of his replacement at Fulton for two days per week, Defendant Taylor curtly stated: *"It is none of your business."*

237.    Plaintiff was subsequently informed that he would eventually be assigned to worksites across all five boroughs, including Staten Island, with no consideration given to the logistics of travel. When Plaintiff questioned this, Director Taylor callously responded: *"I don't care how you get there."* This directive was inconsistent with the prior representations made to Plaintiff during his hiring interview, and by Robin Yudkovitz, wherein he was told he would be stationed primarily at a single Manhattan location during his tenure at PHTO.

238.    On December 19, 2022, Plaintiff attended a Teams meeting for his introduction to Robin Reed, the Property Manager at Bronx Union Avenue Consolidated.

239.    The following day, Plaintiff reported for duty at Union Avenue Consolidated for the first time.  Their tenant filing system is completely different from Fulton Houses and Park Rock's.  That same day, Defendant Gibbs confirmed via email Plaintiff would be required to vacate his workstation at Fulton Houses two days per week to accommodate Ms. Candace Edwards—a Community Associate who held a lower civil service title and who had only been with NYCHA for a few months prior.

240.    Defendant Gibbs indicated that Plaintiff and Ms. Edwards would: *"split the work,"* assigning Plaintiff to accounts 136.001.01A through 136.006.13J and Ms. Edwards to accounts 136.006.14A through 136.011.06F, collectively comprising approximately 460 units.

241.    No explanation was given as to why Plaintiff, a Community Coordinator, could not handle the work independently over a five-day period. Upon information and belief, Ms. Edwards had threatened to resign if assigned to the Bronx, and management displaced Plaintiff—despite knowledge of his mental health disabilities—solely to appease Ms. Edwards, who held a lower civil service title and less seniority.

242.    Plaintiff reasonably believed this reassignment amounted to a de facto constructive demotion, as he was now performing the same tasks as an employee with a lower civil service title and less seniority, while at a lower pay scale than said Community Associate.

243.    During a subsequent Teams meeting attended by Defendants Taylor, Ramseur-Deliotte, Gibbs, Property Manager Robin Reed, and Plaintiff, Plaintiff again expressed he had not received adequate training. Defendant Gibbs became visibly agitated and falsely asserted Plaintiff had been trained.  Plaintiff objected, and Property Manager Reed corroborated Plaintiff had not been adequately trained.  Director Taylor then admitted she had been "unaware" of Plaintiff's lack of training on the Siebel and AS400 systems and pledged to remedy the issue.

244.    Plaintiff was humiliated during this meeting.  Despite his training deficiencies, both Property Managers Robin Reed and Patrick Chan expressed satisfaction with Plaintiff's actual performance, which was limited mostly by the lack of instruction he had received from PHTO—a fact verifiable through training records required to be still maintained by NYCHA.

245.    Plaintiff questioned Defendants Taylor & Gibbs regarding the ongoing retaliation, favoritism, and disparate treatment—particularly the decision to force him to work in hardship locations, while accommodating employees such as Ms. Edwards and Comm. Assoc. N. Farley.

246.    Despite repeated complaints to Defendants Taylor, Ramseur-Deliotte, and Gibbs, no remedial actions were taken, and no relief from the above-stated retaliatory treatment came.

*Disciplinary Action and Leave Management*

247.    On December 21, 2022, Plaintiff received a "counseling memorandum" citing alleged "lateness and absences." These allegations were largely attributable to transit delays, to difficulties accessing secured time clocks, and workplace-related stress. The memorandum failed to account for NYCHA's established 6-minute time grace period nor Plaintiff's known medical conditions.  Plaintiff was selectively targeted for discipline immediately upon transfer to PHTO.

248.    Although Defendant Gibbs signed the memorandum, it was deemed authored by Defendant Taylor, as evidenced by her consistent misspelling of "Manual" as "Manuel"—one of several recurring errors in her specious written communications.

249.    Defendants Taylor and Gibbs referenced three absences, three early departures, and ten instances of lateness over a two-month span. However, one of those days involved management forcing Plaintiff to take a mandated 'sick day' to obtain a COVID-19 test due to exposure to COVID-19 at the workplace.  Plaintiff reported to work that day and was sent home.

250.    Plaintiff's treating psychologists letter was submitted to NYCHA's Return-to-Office Unit with his RAR, affirming Plaintiff's occasional tardiness and absences were directly attributable to his diagnosed depression and anxiety; clinical conditions which were substantially aggravated by the hostile work environment to which he was continuously again subjected to.

251.    The increasingly hostile nature of Plaintiff's workplace conditions resulted in several days of missed work due to the severity of his mental health symptoms.  Plaintiff was unable to utilize any sick leave during this time, as his leave balances had been then improperly exhausted during his earlier, involuntary placement on the still-unspecified forced unpaid leave.

252.    On December 29, 2022, Plaintiff, in compliance with proper notice procedures, informed Defendant Gibbs via personal email that he would not be reporting to work that day.

253.    Despite this notice, Defendant Gibbs falsely accused Plaintiff of being "AWOL." At no time had Plaintiff been absent without leave; rather, he had communicated his absence in advance to his immediate supervisor.

254.    Plaintiff was compelled to use his personal email account for correspondence because his official NYCHA email account had been inexplicably, intermittently disabled for approximately one month following his formal complaint of discrimination and retaliation to the NYCHA Department of Equal Opportunity ("DEO").

### *Deficient Performance Evaluation, and Procedural Violations, with Aiding and Abetting by Defendant Marla Edmonson*

255.    On January 3, 2023, Plaintiff was issued a "4th Quarter Supervisory Probationary Report/Evaluation" (NYCHA Form 015.134 Rev. 4/17), a form designated solely for supervisory personnel.  Plaintiff held a non-supervisory Community Coordinator title, rendering the entire evaluation procedurally improper and inapplicable, in addition to being outside the statutory time limit to evaluate an employee on a required "quarterly" basis by almost two calendar months. Applicable would have been 4 regular probationary evaluations concerning 11/18/22 to 11/17/23.

256.    The evaluation assessed **manager** categories such as Leadership, Planning and Organization, Results on Job, Knowledge of Work, Cooperation, Judgment, and Attendance — six of which were irrelevant to Plaintiff's role, as he neither supervised staff nor led any division or team. Taylor at one point briefly mislead Plaintiff as to allegedly "managing" Mr. Rodriguez, whom Plaintiff never met, and instead just replaced in a file-collating role at the Bronx location.

257.    Plaintiff's prior evaluations dated February 17, May 17, and August 17, 2022, were (procedurally) properly conducted on NYCHA Form 015.143B, which assesses Quantity and Quality of Work, Cooperation, Learning Capacity, and Attendance for non-managerial staff.

258.    In the January 3, 2023, evaluation:

- Leadership: Defendant Gibbs rated Plaintiff at the lowest level, alleging antagonistic behavior without factual support. Plaintiff had no subordinates to lead nor antagonize.

- Planning and Organization: Gibbs falsely claimed Plaintiff was unable to meet a 15-file quota due to poor planning; failing to acknowledge that Plaintiff lacked adequate training, software access, and essential tools. Gibbs further stated Plaintiff's *"subordinates were too dependent,"* on him, despite the fact Plaintiff did not hold a supervisory role and had **no** subordinates to delegate work to nor manage.

- Results on Job: Gibbs rated Plaintiff as "below normal," stating he "does not demonstrate a willingness to do what it takes to get the job done right." This assertion totally ignored Plaintiff's ability to complete assignments was directly hindered by Defendants' failure to provide the proper resources, software & training necessary to perform his allotted duties.

- Knowledge of Work: Gibbs alleged Plaintiff lacked job knowledge despite the minimal, deficient training provided and lack of access to NYCHA's essential systems and work tools.

- Cooperation: Plaintiff was improperly accused of creating friction and *having difficulty managing subordinates* — a baseless claim as Plaintiff had no subordinates.

- Judgment: Gibbs made vague, unsubstantiated claims of poor decision-making.

- Attendance: Defendants' continued reliance on Plaintiff's attendance as a basis for criticism was pretextual, given his known, documented disabilities and reasonable accommodation requests; as well as difficulties accessing NYCHA Property Management facilities.

259.    Plaintiff received an overall "Unsatisfactory" rating. None of Plaintiff's similarly-situated, non-supervisory colleagues — including Bernardo Rodriguez (Staff Analyst), Candice Edwards, and Nathaniel Farley (Community Associates) — were issued Supervisory Probationary Reports.

260.    The evaluation was also prematurely issued before the conclusion of Plaintiff's first three-month probation period, had he begun the probationary process anew. Plaintiff began working at/transferred to PHTO on October 17, 2022. The earliest permissible (initial) first quarter evaluation date at PHTO would have been January 17, 2023; otherwise it was expired.

261.    Although attendance memoranda had previously been issued, Supervisor Gibbs **never** documented or communicated any performance-related concerns until this 'evaluation'.

262.    No performance concerns were documented by onsite supervisors Robin Reed (Union Avenue Consolidated) or Patrick Chan (Fulton Houses), both of whom found Plaintiff cooperative and diligent.  Before this 'evaluation', Plaintiff had not received any counseling memoranda, warnings, or disciplinary action related to any form of job performance at PHTO.

263.    Defendant Gibbs, the author of the evaluation, lacked firsthand knowledge of Plaintiff's job performance. She visited Plaintiff's Manhattan worksite (Fulton Houses) only once briefly and never once visited his South Bronx worksite (Union Avenue Consolidated).

264.    Defendant Ramseur-Deliotte and Lisa Leong visited Fulton Houses once and confirmed that *"everything was fine."* Neither Defendant Taylor nor Ramseur-Deliotte, both of whom worked remotely three days per week, documented any performance concerns. Ms. Gibbs remained based in Park Rock Houses, Brooklyn.

265.    The January 3, 2023 evaluation was pretextual and retaliatory, issued in direct response to Plaintiff's protected activities and complaints of discrimination and retaliation, which had been formally communicated to NYCHA's DE0 and Robin Yudkovitz, among others.

266.    Defendant Gibbs deliberately assigned Plaintiff the lowest, or near-lowest, ratings in each performance category to manufacture justification for an overall unsatisfactory rating. In an effort to further rationalize this rating, Gibbs cited Plaintiff's inability to meet a 15-file quota, despite knowing Plaintiff had been assigned the quota only eight business days earlier and had not been provided with the necessary tools (software), training, or resources to complete such.

267.    On January 4, 2023, Defendant Taylor convened a Microsoft Teams meeting with Plaintiff, Gibbs and Ramseur-Deliotte to discuss the evaluation. When Plaintiff challenged the evaluation's legitimacy, Taylor falsely claimed it had been "automatically generated" by an HR email account, as normally happens due to a U.S. Federal Monitor mandate placed on NYCHA.

268.    During the meeting, Plaintiff observed an email from HR Marla Edmonson on

Taylor's shared computer screen. Said email contained Plaintiff's name, employee number, and

attachment labeled "evaluation," evidencing Edmonson's knowing involvement in this adverse

employment action. The email was dated on or about January 2nd, 2023.

269.    Following this virtual meeting, Taylor emailed Plaintiff with a copy of the

improper Supervisory Probationary Report, also sending copies to at least all parties involved.

***Plaintiff's Complaint Regarding Discrimination, Retaliation, Hostile Work Environment, and Deficient Working Conditions***

270.    On January 9, 2023, Plaintiff submitted a formal written rebuttal to Defendants

Taylor, Ramseur-Deliotte, and Gibbs. It stated: (1) he lacked access to any job-critical systems

including Seibel and AS400, as well as the necessary equipment to perform his duties; (2) he had

been subjected to retaliation and disparate treatment, particularly compared to colleague Candace

Edwards; (3) he was working in a hostile environment; (4) Defendants conspired to terminate

him in violation of his civil rights; and (5) his evaluation was untimely and retaliatory following

his reasonable accommodation request, which led to his transfer to PHTO and continued harm.

271.    Plaintiff worked under materially deficient conditions: he was not provided with a

laptop, mobile phone, or MiFi device as promised, and proper email account access; received no

comprehensive training in essential NYCHA systems (only a brief 10-minute self-overview of

Seibel and none on AS400); and lacked access to passwords for the above, plus necessary tools.

272.    Plaintiff was forced to rely on Housing Assistants and Secretaries, including

Robin Chavers and John Johnson at Union Consolidated and Poonam Goel at Fulton Houses to

meet assignment demands. Without their assistance, the imposed 15-file quota was unattainable.

273.    In contrast, employees at other locations had been properly trained and were fully

equipped.  Ms. Edwards received full and complete training, was granted access to Siebel and

AS400, and was not required to rely on Housing Assistants to perform any of her job functions.

274.    Plaintiff and Candice Edwards both began working at PHTO in 2022 — Plaintiff as a Community Coordinator on probation, and Edwards as a Community Associate. They both shared identical duties, supervisors (Carolyn Gibbs, LaToya Ramseur-Deliotte, and Kimberly Taylor), and were subject to, or should have been subject to the same evaluations and standards.

275.    Upon information and belief, Ms. Edwards was in no way disabled or challenged (physically/mentally), had not requested a reasonable accommodation, and was not subjected to any variation of the stigmatizing and duress-inducing conduct Plaintiff endured.

276.    On January 10, 2023, Plaintiff had emailed Defendant Gibbs, advising he could not meet the fifteen-file quota as he was still awaiting affidavits from Housing Assistants. Gibbs did not respond.

## IX.    Discrimination, Retaliation, and Wrongful Termination by Defendants

277.    On January 19, 2023, Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), naming Rudy Murillo, Anthony Luciano, HR Director Robin Yudkovitz, and PHTO Director (Kimberly Taylor) as responsible parties. The Charge alleged violations under the ADAAA, including disability discrimination, disparate treatment, retaliation, hostile work environment, and interference with Plaintiff's ADAAA rights.

278.    Plaintiff was advised by EEOC Investigator Christopher Fuentes that EEOC would contact NYCHA on January 20, 2023. Under federal regulations, NYCHA must be statutorily notified of the Charges within a maximum of ten days of Plaintiff's initial filing.

279.    Plaintiff commenced a pre-approved vacation from January 25, 2023, through February 2, 2023.

280.    On February 3, 2023—Plaintiff's first day back—Defendant Taylor scheduled a Microsoft Teams meeting with Plaintiff and his immediate supervisor, Defendant Gibbs. Plaintiff later learned Taylor, previously named in his EEOC complaint, intended to terminate him during this meeting.

281.    Without explanation, Defendants Taylor and Gibbs were replaced in the meeting by Senior Vice President Sylvia Aude-McCullough and Deputy Director of Human Resources Amanda Donohue.

282.    During the meeting, Defendant Aude-McCullough terminated Plaintiff's employment, citing a fourth-quarter supervisory evaluation and via claiming he failed to meet expectations and had allegedly received "verbal warnings". She also referenced two old negative evaluations from Plaintiff's **prior** role at OEM; despite different duties, reporting structures, and a final 3rd Quarter satisfactory evaluation, in a markedly different emergency responder position.

283.    Defendant Aude-McCullough stated:

"You've received unsatisfactory ratings on your first, second, and fourth quarter probation reports, and you also received a counseling memo for time and attendance. Unfortunately, Mr. Fields, you are not meeting our expectations that we set in our department, and we determined that you are not a good fit for this role. Umm, we are terminating your employment, and today will be your last day. Umm, you will receive your termination letter, umm, shortly after this to your personal email address. This has been **approved by**, you know, **HR**, as well as, you know, **the management team,** you know, so at this point, umm, the decision is final and we all can't…" …."If you have any concerns, you can reach out to Employee Relations."

284.    Plaintiff twice asked whether his termination was related to his EEOC complaint. Both Defendant Aude-McCullough and Donohue refused to answer. The false fourth-quarter evaluation cited as grounds for termination had been reviewed by Defendants Gibbs, Ramseur-Deliotte, Taylor, Aude-McCullough, Edmonson, Donohue, Yudkovitz, and NYCHA's Law Department. None questioned nor objected to using a supervisory evaluation to terminate a non-supervisory employee, contrary to established DCAS and NYCHA policy.

285.    NYCHA's Senior Vice President of Human Resources, Nicole Van Gendt, previously testified that termination meetings should involve the employee's only immediate supervisors and an HR representative—not executive leadership—so indicating the Defendants knowingly and willfully altered standard procedures following Plaintiff's timely EEOC charge.

286.    Defendant Donohue was the final decision-maker and signed Plaintiff's Notice of Termination on behalf of Van Gendt. Contrary to policy requiring the employee's supervisor to present the termination letter, it was delivered by Defendant Ramseur-Deliotte, further distancing Defendants Taylor and Gibbs from direct involvement after headlining Plaintiff's EEOC action.

287.    The substitution of personnel and deviations from NYCHA's own standard, well established termination procedures, immediately following Plaintiff's EEOC filing, was a quick-coordinated effort to insulate key actors from liability.

288.    On February 6, 2023, Plaintiff informed EEOC Investigator Fuentes of his termination. At Fuentes' request, Plaintiff provided him with a copy of his termination letter.

## X.    Defendants Discriminated and Retaliated Against Plaintiff Based on His Actual or His Perceived Mental Disabilities by Bypassing NYCHA's Set Progressive Discipline and Termination Procedures

Plaintiff's termination was procedurally improper and discriminatory, as Defendants ignored NYCHA's established termination policies, bypassed required documentation, and deviated from standard practices appropriately applied to other similarly situated employees.

289.    NYCHA's Human Resources Manual requires before terminating an employee, the supervisor **shall** submit a memorandum with supporting documentation to the Department Director for approval. This **must** include specific facts, dates, and a record of corrective actions, such as counseling memoranda and performance evaluations; and any chain of evidence for such.

290.    Plaintiff never received any instructional or counseling memoranda, write-ups, or documented warnings related to his performance at PHTO. The only counseling memo Plaintiff

ever received involved attendance.  Accordingly, Defendants could not have produced any duly required documentation supporting Plaintiff's termination, aside from a procedurally deficient, Time-expired, non-applicable and falsely construed fourth-quarter supervisor's evaluation.

291.    Although the Defendants regularly 'enforced' HR policies during Plaintiff's employment, they disregarded those same policies in terminating him. Defendant Gibbs was procedurally obligated to consult with Employee Relations Coordinator Marla Edmonson and HR Deputy Director Amanda Donohue before initiating termination proceedings to the record.

292.    Defendant Edmonson was aware of both the problematic evaluations and hostile work environment Plaintiff faced, yet failed to intervene. She later submitted an untimely and improper evaluation for PHTO use, and ultimately advised on Plaintiff's improper termination.

293.    Defendant Edmonson further affirmed in a previous legal proceeding's sworn Affidavit it is a violation of NYCHA's General Regulations of Behavior for any employee to engage in dishonest conduct; including fraud, deceit, falsifying or inappropriately altering any NYCHA document, record, file or form or to **knowingly submit** falsified or inappropriately altered documents, records or forms to NYCHA, or while conducting official NYCHA business.

294.    According to NYCHA's Senior Vice President of Human Resources, Nicole Van Gendt, standard termination procedures require the employee's supervisor to initiate the request, which Human Resources then reviews and finalizes. Legal review by NYCHA's in-house Law Department is mandatory to ensure compliance with all applicable Federal, State and local laws.

295.    Defendants decided to terminate Plaintiff right after EEOC Investigator Christopher Fuentes contacted NYCHA. Plaintiff later obtained a Time Detail Report on March 23, 2023, revealing that his last **recorded work date** was January 24, 2023—just three business

days after he filed his EEOC charge—even though his employment officially ended on February 3, 2023.

296.    In contrast, NYCHA properly followed its termination procedures in other cases. For example, probationary Housing Assistant Theodore Lytwyn's termination was supported by a termination memorandum, productivity reports, counseling memoranda, and various related documentation. Such rendered him eligible for rehire to another/his former position as a CIR.

297.    Similarly, probationary employees Gordon Mohammed (Field Coordinator), Xiamin Zeng (Caretaker), Jozaida Sanchez (Caretaker), Yolanda Nunez (Exterminator), and Kimberly Tyre (Resident & Emergency Preparedness Associate) each received multiple counseling memoranda documenting their poor performance and/or workplace conduct issues. Their terminations were subsequently processed through proper procedure, including submission of a standard termination request memorandum accompanied by supporting records detailing the documented deficiencies, and summarizing said deficiencies in a cogent, memorialized manner.

298.    Unlike those cases, Plaintiff's termination proceeded without any such required documentation, progressive discipline, sans any stated logical and non-contradictory reasoning, or with mandatory procedural safeguards; showcasing how uniquely prejudicial his firing was.

## XI.    Defendants' Shifting Justifications, Contradictory Statements, and Lack of Documentation Undermine the Legitimacy of Plaintiff's Termination

299.    In response to Plaintiff's EEOC Charge, Defendant NYCHA submitted a position statement on March 23, 2023, claiming without details that: *"Charging Party's performance during his probationary period was subpar,"* referencing only two questionable evaluations from Plaintiff's prior assignment at the Office of Emergency Management ("OEM"), dated February 17 and May 17, 2022. Numerous NYCHA parties were informed said evaluations were suspect.

300.    These evaluations predated his termination by nearly a year and pertained to a different title, job description, and supervisors than his subsequent position at PHTO, from which he was ultimately terminated. Defendants offered no information about Plaintiff's performance, conduct, or discipline at PHTO, failed to mention any counseling memos, and then strategically ignored the incorrect and erroneous fourth quarter 'evaluation' issued to Plaintiff by NYCHA.

301.    Defendants did not explicitly state the evaluations were the reason for Plaintiff's termination.  They failed to directly address any specific reasons for Plaintiff's termination, merely asserting Plaintiff was reassigned to PHTO on October 17, 2022, and so noting in a purposely understated footnote that he was subsequently terminated from said PHTO position.

302.    Notably, this omission contradicted Defendant Aude-McCullough's ill-stated rationale for Plaintiff's termination at the time of occurrence.  Defendants failed to substantiate any adverse performance issues or subpar work habits at PHTO in their EEOC submission.

303.    Similarly, on April 28, 2023, when asked by the New York State Department of Labor ("NYS DOL") to provide reasons for Plaintiff's termination, NYCHA stated it was for *"poor performance."* Yet when pressed for examples or documentation, NYCHA provided none. The adjudicator noted: "*There was no specific incident that prompted your decision to discharge the claimant and no documentation to support that the claimant was not working to the best of his ability.*" As a result, the NYS DOL ruled Plaintiff eligible for full unemployment benefits.

304.    In a form sent to Defendant NYCHA, NYS DOL asked why Plaintiff was then unemployed, offering absenteeism as an option. Defendant NYCHA did not select such, nor did they at any point reference lateness or absenteeism as ultimate reason for Plaintiffs termination.

305.    Defendants' proffered reasons for terminating Plaintiff shifted repeatedly and remained unsubstantiated at every stage.

306.    NYCHA's General Regulations of Behavior explicitly prohibit providing false or misleading information to the Inspector General, Law Department, Equal Opportunity Office, or any NYCHA office or **external governmental entity**.

## XII.    Defendants' Inconsistent, Unsupported, and Shifting Explanations Reveal Retaliatory Pretext for Plaintiff's Forced Unpaid Leave

307.    In their March 23, 2023, EEOC position statement, Defendants sought to justify placing Plaintiff on an involuntary 34-day unpaid leave on September 12, 2022—just four days after he requested  reasonable accommodations—by falsely claiming that night driving was an essential job function of emergency services, and supervisors properly instructed him to submit an accommodation request and somehow assign himself  leave pending unspecified HR review.

308.    Defendants asserted **all** Field Coordinators worked a 4:00 PM to 12:00 AM shift, contradicting their own allowances for coworker Myra Miller, who was granted daytime remote work accommodations without using leave nor facing furlough.  Murillo approved FC Miller's daytime schedule without HR involvement and retroactively submitted her documentation to HR.

309.    Defendants further claimed Plaintiff was not "ejected" from his LIC worksite but sent home for his own safety.  However, the night before, Plaintiff had worked a full solo 4:00 PM–12:00 AM shift and drove a NYCHA emergency vehicle to LIC alone—undermining any claim of sincere concern for his well-being.   At no time did Plaintiff engage in disruptive, loud, or belligerent behavior in the workplace. Nevertheless, security was summoned immediately after Plaintiff attempted to submit his formal Reasonable Accommodation Request, despite the absence of any conduct or incidents warranting such, and sans concerns for Plaintiffs wellbeing.

310.    Defendants' Position Statement justification later shifted to claim Plaintiff was placed on an *"approved leave of absence."*  Yet, HR Director Yudkovitz expressly informed

Plaintiff—confirmed via multiple emails—he was neither furloughed nor on an HR-approved leave and advised him to apply for one if desired, despite Plaintiff never requesting any leave.

311.    Defendants' March 23, 2023, position statement contradicted itself by asserting both that Plaintiff was on an approved leave "because, by his own statements, he was unable to perform the essential functions of his job," and that "temporary leave pending reassignment… is an appropriate accommodation."

312.    Internal records further conflicted with these claims. A lead PHTO secretary had documented Plaintiff's status as a *"suspension,"* not a leave of absence, noting adjustments to his pay for the **suspension start date**. In contrast, NYCHA's filed position statement dismissed Plaintiff's allegations of an unauthorized furlough as *"disingenuous", "nonsensical"* and *"wildly exaggerated*.*"*; without offering any other legitimate explanations for his forced leave*.*

313.    On April 6, 2023, NYCHA Associate Staff Analyst Franklin Velez confirmed to a New York State Department of Labor adjudicator that Plaintiff had, in fact, been **furloughed** in September 2022 and returned October 16, 2022, directly contradicting NYCHA's prior denials.

## XIII.   Disparate Treatment of Plaintiff Compared to Similarly Situated Employee Regarding Reasonable Accommodation Requests at EMSD

### *Disparate Treatment and Retaliatory Conduct by Murillo and Yudkovitz*

314.    In June 2023, Plaintiff was granted full access to all emails, Reasonable Accommodation Requests (RARs), and medical documents related to Mrs. Myra Miller's accommodation concerns directly from her, with permission to reference such documents.

315.    Upon reviewing these documents, Plaintiff observed clear disparities in how Defendants at NYCHA handled their similar accommodation requests. While Plaintiff faced retaliation and insurmountable barriers despite submitting comparable medical documentation, Mrs. Miller's requests were promptly addressed and approved without issue, beginning at the

same inception point as Plaintiff's requests, progressing from Murillo to RTO to NYCHA HR.

316.    Both Plaintiff and Myra Miller were hired as Field Coordinators at NYCHA OEM in November 2021, held the same probationary status, received identical training, had the same duties, and were evaluated and supervised by Defendants Luciano, Murillo and also Ms. Torres.

317.    When Myra Miller became unable to drive or perform essential job functions due to a physical disability, she requested to work remotely directly from Defendant Murillo on April 26, 2022, and he immediately granted her requests.

318.    The following day, Defendant Murillo emailed RTO, attaching Miller's RAR and doctor's note, while simultaneously approving Miller's temporary telework until May 15, 2022.

319.    On June 28, 2022, Defendant Murillo informed RTO of Miller's updated RAR and extended her remote work. RTO formally approved her accommodation on July 1, 2022.

320.    On July 25, 2022, Murillo submitted another updated RAR with a doctor's letter recommending, *"No Field Work, No Driving, and currently as of 7/21/2022 No walking"* to RTO.

321.    On August 19, 2022, RTO extended Miller's accommodation through September 30, 2022, instructing that absent a further request, she would have to return to in-person work on October 3, 2022.

322.    On September 14, 2022, Miller submitted a new RAR and doctor's note stating, *"It will be indefinitely for Ms. Myra Miller to return to work full duty at this time."* If an estimated date was necessary, the doctor recommended **June 12, 2023**, with restrictions including *"No Excessive Walking, No Driving, No Field Work, No Weight Bearing Pressure."*

323.    The same day, RTO inquired whether Miller had been reporting to fieldwork, noting she hadn't clocked in.

324.     Murillo replied:

"No, she has not been reporting to field work as she cannot perform the duties due to her medical condition. Since she was going to appeal and provide additional paperwork, she has been held in her current accommodation until 9/30… where she will be transferred to a **new position** and required to **return to the office**."

325.     On September 30, 2022, Mrs. Miller informed RTO that Dir. Murillo had instructed her to resend her RAR and supporting documents 'ASAP,' and stated he would sign it upon his arrival at work.  Mrs. Miller continued working remotely through at least September 30, 2022.  In total, her remote work accommodation remained uninterrupted and continuous for over five months.

326.     On October 3, 2022, approximately 23 days after Plaintiff was placed on an involuntary unpaid leave, RTO sent an email to Mrs. Miller stating: "To the extent your essential functions require you to report to the field, you are expected to do so (and may not work from home on those days). If you are unable to do so, **you must request** the use of leave."

327.     This directly contradicts Defendants' treatment of Plaintiff, who was placed on leave without any request on his part and without OEM following this stated policy or procedure. Furthermore, the email makes no mention of a requirement to drive, undermining Defendants' subsequent claims driving was an essential function necessitating Plaintiff's removal from duty. It implies field duties were only required on certain days, with employees permitted to work remotely on others as a matter of standard policy in the Emergency Services departments.

328.     Mrs. Miller was ultimately transferred to a new department (procurement), where she continued working modified duties. This sharply contrasts with Plaintiff's experience and treatment by NYCHA, whereas his comparable accommodation requests were ignored & denied.

***Discriminatory and Retaliatory Conduct by Robin Yudkovitz, with the Aiding and Abetting of Sharda Shrestha***

329.    Unlike Mrs. Miller, whose physical disability led to an immediate remote work arrangement, Plaintiff was placed on involuntary unpaid leave based on Defendants' personal/institutional perceptions of his mental health condition.  Sadly, Myra Miller is now deceased.

330.    Plaintiff was never offered an opportunity to request nor receive any reasonable accommodation before Murillo requested his removal from the workplace. Instead of providing modified or remote duties, as they did for Miller, Defendants forced Plaintiff to exhaust accrued leave, resulting in lost wages and health insurance, and a myriad of other debilitating issues.

331.    Sworn deposition testimony from Defendant Yudkovitz, NYCHA's Director of Human Resources, in an unrelated legal proceeding revealed persistent deficiencies in her and NYCHA's handling of reasonable accommodation requests. In that testimony, Yudkovitz stated: "*The accommodation is to help someone to perform the essential functions, not to remove functions. And any work that would be in addition to that, I don't see as removing essential functions*."

332.    Based on that same deposition, both Yudkovitz and Shrestha reviewed all emails Plaintiff sent to the RTO mailbox, in which he explicitly reported discrimination, retaliation, and undue hardship. Despite having direct access to these complaints through their routine oversight of the RTO mailbox, neither Defendant took any steps to investigate, mitigate, or duly respond— further evidencing NYCHA's pattern of deliberate indifference to disability-related grievances.

333.    If, as Defendant Yudkovitz claims, accommodations cannot eliminate essential functions, then driving cannot be considered an essential function, as Mrs. Miller's remote work arrangement entirely eliminated the need for it.  Defendant Yudkovitz, in her capacity as HR Director, is responsible for reviewing and rendering decisions on specific RAR cases requiring Human Resources Department actions and decisions as to capabilities to work, or file section 72.

334.    Defendant Sharda Shrestha served as NYCHA's only Employee Reasonable Accommodation Coordinator (ERAC) during the relevant time period and was charged with the responsibility of processing, evaluating, and facilitating Reasonable Accommodation Requests (RARs), including that of the Plaintiff and Mrs. Miller's.

335.    Sharda Shrestha and Marla Edmonson reported to HR Deputy Director Amanda Donohue.  Donohue, in turn, reported directly to HR Director Yudkovitz, who reported directly to Nicole Van Gendt, NYCHA's Vice President of Human Resources and also herself a seasoned attorney.

336.    In her role, Defendant Shrestha worked directly with Yudkovitz to coordinate accommodations and was responsible for ensuring their lawful implementation. As a member of the Return- To-Office (RTO) team and an individual with access to the RTO mailbox, she had direct knowledge of Plaintiff's submitted documentation, including his psychological evaluations and detailed communications outlining the urgent nature of his condition and the retaliation he was experiencing. Not accessing said mailbox would have been willful negligence on her part.

337.    Despite having full access to Plaintiff's RAR and professional knowledge of his circumstances—including being wrongfully placed on indefinite unpaid leave, denied medical coverage, and subject to retaliatory discrimination—Shrestha took no credible steps to resolve or mitigate such nor to advance the accommodation process to alleviate the harm befalling Plaintiff.

338.    She failed to respond to Plaintiff's repeated written pleas for assistance and did not engage with him to initiate the interactive process mandated by law.  Her inaction not only allowed Defendants Murillo and Luciano to continue their unlawful conduct unimpeded but also constituted willful indifference and deliberate neglect of her duties and authority as the ERAC.

339.    By failing to intervene or take corrective action, even after subsequently receiving documentation of discrimination and retaliation, Shrestha then knowingly and willfully enabled ongoing violations of Plaintiff's rights. Her silence and inaction directly contributed to the harm suffered by Plaintiff and reflected on her participation in and facilitation of discriminatory and retaliatory conduct by her colleagues at NYCHA.

340.    Defendants Yudkovitz and Shrestha jointly processed reasonable accommodation requests ("RARs") as part of a team within NYCHA's Return to Office Unit. Normal RARs were submitted through the centralized RTO email address, to which both above-named Defendants had direct access. They regularly monitored the mailbox, responded to accommodation requests, and held meetings once or twice a week to review pending matters.   Defendants also remained in regular contact with various department supervisors regarding employee accommodations.

341.    During the same period Plaintiff submitted his RAR, a co-worker, Myra Miller, requested an extension of her existing reasonable accommodation. Both RARs were received within two days of each other and ergo discussed by Defendants during their regular meetings. NYCHA was fully aware that Defendants Murillo and Luciano had placed Plaintiff on an involuntary unpaid leave after falsely asserting driving at night was an essential function of his position —and had done so despite Plaintiff's voluntary disclosure of his mental and ocular health conditions in seeking logical accommodations, instead of simply following proscribed labor laws.

342.    In contrast, Myra Miller, who held the same title and job duties as Plaintiff, was permitted to work remotely full-time due to a strictly physical disability. Although Miller was unable to perform nearly any essential functions of the position and had a projected return date nearly a year later, her accommodation was repeatedly extended.

343.    Defendants Yudkovitz and Shrestha maintained ongoing communication with Defendant Murillo concerning Miller's accommodation request and remained in direct contact with Miller throughout the process. In stark contrast, they made **no** effort to engage Plaintiff regarding his RAR, nor involve him in any interactive process to explore any interim solutions.

344.    While Miller's accommodation was promptly granted and she continued working remotely for five months, Plaintiff was forced onto involuntary unpaid leave for thirty-four (34) days without pay while awaiting supposed reassignment, due to his mental disability disclosure. Defendants subjected these similarly situated employees to disparate treatment, despite holding the same job title and submitting RARs within the same timeframe.

### *Misrepresentation of Job Requirements Following Plaintiff's Accommodation Request*

345.    Following Plaintiff's reassignment, Defendant Murillo reposted the EMSD Field Coordinator position — Plaintiff's former role — without materially altering the job description. Critically, possession of a valid driver's license remained a *preferred*, not required, qualification in the December 29, 2022, July 14, 2023, and October 21, 2024, postings.

346.    Additionally, on or about December 29, 2022, Defendant Murillo revised the job posting for the Field Coordinator position. The business title was changed from "OEM Field Coordinator" to "EMSD Field Coordinator."

347.    While the job description remained substantively the same, Defendant Murillo retained the language describing possession of a driver's license as a preferred skill, consistent with the job posting for which Plaintiff had applied approximately eighteen (18) months earlier. However, Defendant Murillo altered the phrasing from "possession of a valid NYS driver's license in good standing" to "possession of a valid driver's license in good standing." At no point was driving listed as a required skill for the position.

348.    By contrast, other EMSD job postings during this period explicitly identified a valid New York State driver's license as a **mandatory** requirement ergo where driving was an essential job function. These included:

- EMSD ARBS (posted November 30, 2023)
- EMSD Assistant Resident Building Superintendent (posted March 4, 2024)
- EMSD Resident Building Superintendent (posted March 24, 2024)
- EMSD Flood Protection Supervisor (posted March 17, 2024)
- EMSD Caretaker X (posted April 1, 2024)

349.    Each of these postings stated in the "Additional Information" section: "A Motor Vehicle Driver's License valid in the State of New York is **required** for this position. The license must be maintained for the duration of the assignment" or via similar language.

350.    Driving was never an essential function of the Field Coordinator position, as demonstrated after Plaintiff was placed on involuntary unpaid leave and then subsequently reassigned to the PHTO position. Shortly thereafter, FC Kenneth Harley fractured his foot and was out on medical leave for over three months, leaving EMSD without any Field Coordinators scheduled to work on Sundays and Mondays; so highlighting that driving was non-essential.

351.    Under these circumstances, Plaintiff could have been duly granted the effective interim reasonable accommodation he requested, which would have allowed him to continue working uninterrupted until his reassignment. Notably, a comparative replacement Field Coordinator was not hired to EMSD until nearly a year later.

## XIV.    Pattern of Discriminatory Treatment Against Employees with Actual or Perceived Mental Health Disabilities

352.    Defendant NYCHA has engaged in a pattern and practice of treating employees with actual or perceived mental health conditions less favorably than other employees. One such example is Richard Washington, a permanent Community Information Representative CIR with a strong work record, who disclosed symptoms including insomnia, fatigue, anxiety, and blurred

vision. His supervisor responded by questioning his medication use and suggesting psychiatric evaluation. Although Mount Sinai Hospital found Mr. Washington to have fixed false beliefs but no risk of harm to himself or others, NYCHA disregarded this medical opinion and labeled him "dangerous." Mr. Washington's supervisor believed he could no longer perform the essential functions of his job and initiated a Section 72 referral.

353.    Mr. Washington was suspended, forced to exhaust accrued leave, and lost wages and benefits. NYCHA's doctor placed him on extended involuntary medical leave, which he contested at a judicial hearing. Despite the Administrative Law Judge recommending dismissal of all charges against Washington, NYCHA rejected the Court's ruling and denied his lawful reinstatement. Summarily, Washington ultimately filed an EEOC charge and federal lawsuit, regaining his position after more than two and a half years, with his back benefits restored.

354.    Plaintiff experienced similar discriminatory treatment. Like Mr. Washington, Plaintiff was placed on involuntary unpaid leave without legitimate cause, forced to exhaust accrued leave, denied wages and health insurance, and deprived of due process — all at the direction of his supervisor and NYCHA, in contravention of applicable law.

**XV.        Plaintiff's Reassignment to PHTO Constituted a Constructive Demotion**

355.    On or about May 9, 2023, Plaintiff discovered NYCHA had reposted his former PHTO position on the NYC Careers website. The reposted job was listed seeking a Community Associate (Career Level: Entry Level) with a salary range of $38,333 to $63,794, sans college degree requirement and the experience component required for a Community Coordinator job.

356.    When Plaintiff held the same position, it was classified strictly as Community Coordinator (Career Level: Experienced) required, which mandated a college degree and offered a higher salary range of $54,100 to $83,981 per annum; yet was filled by Community Associates.

357.    Plaintiff was effectively forced out of his position within the NYCHA Emergency Management Services and career track when EMSD management informed Plaintiff he was not permitted to return to his worksite and instructed him to leave immediately, via their threatening security involvement to enforce his removal by concerted physical means and/or threat of arrest.

358.    With no alternative provided and no return-to-work directive forthcoming, Plaintiff was left in limbo on an involuntary unpaid leave, resulting in the loss of his health insurance and irreparable harm to his professional standing. Facing continued inaction from HR and recognizing his position within EMSD had been irreparably compromised, Plaintiff was therefore compelled to independently identify, and request reassignment to, a different job.

359.    Plaintiff accepted the available transfer under duress, aware that doing so would effectively terminate his career trajectory in the field of emergency management, where he had previously worked and sought advancement. Plaintiffs forced situation placed him in a quandary.

360.    This imposed transfer to a lower-status, less desirable position surely constituted a constructive demotion, as it was the direct result of Defendant's actions in expunging and then excluding Plaintiff from his assigned department, failing to address his workplace concerns, and abruptly leaving him without any viable alternatives to preserve his tenuous employment status and accustomed standard of living.

361.    Upon reassignment to PHTO, Plaintiff was effectively demoted. He retained his Community Coordinator title in name only, and was assigned entry-level duties typically only performed by Community Associates. There were no supervisory or response duties involved.

362.    Plaintiff raised concerns to management about performing the same work as Community Associates Candice Edwards and Nathaniel Farley — both of whom earned higher salaries despite holding lower-ranked titles.

363.    At the time, both Community Associates earned the maximum salary for their title ($63,794), while Plaintiff, though holding a higher-ranked title, earned about $60,500. These two employees had been hired only months before Plaintiff's transfer, and possessed no 'specialties'.

364.    Following Plaintiff's termination, DCAS formally reclassified their position as Community Associate positions, as opposed to Community Coordinator/Staff Analyst titles, subsequently confirming duties Plaintiff was assigned were consistent with an entry-level role.

## XVI.    **Retaliatory Interference with Unemployment Insurance Benefits**

365.    On September 12, 2022, Plaintiff was placed on involuntary unpaid leave by Defendant NYCHA without any formal notice of the leave's classification or Plaintiff's eligibility for unemployment insurance benefits.

366.    Uncertain of his status, Plaintiff sought legal guidance through AVVO, where he was advised that, provided he remained able and willing to work, he could file for requisite unemployment benefits. Relying on this guidance, Plaintiff submitted a valid unemployment insurance claim with the New York State Department of Labor ("NYS DOL") on or about September 30, 2022.

367.    Plaintiff contacted NYS DOL on October 7, 2022, and October 14, 2022, to inquire about the status of his claim and to seek clarification on when benefits would be processed. During this time, Plaintiff properly certified for benefits for the weeks covering September 25, 2022, through October 16, 2022. Despite assurances that payment would be forthcoming, no benefits were then issued.

368.    On November 25, 2022, Plaintiff was advised by a NYS DOL representative that his claim had been mistakenly closed without resolution. Efforts were made to reopen the claim,

and Plaintiff was informed that if approved, benefits would be retroactive to September 26, 2022, with the possibility of backdating to September 12, 2022.

369.    On December 15, 2022, Plaintiff sought the assistance of his local New York State Assembly Member to intervene with NYS DOL. Plaintiff provided written consent and supporting documentation authorizing the Assembly Member's office to communicate with NYS DOL on his behalf.

370.    On December 26, 2022, NYS DOL's SIDES E-Response system issued a high-priority notification to NYCHA personnel, specifically Associate Staff Analyst Franklin Velez and Tihisha Newton, requesting separation information concerning Plaintiff's unemployment claim. The notice clearly identified the claim's effective date as September 12, 2022.

371.    On December 28, 2022, Associate Staff Analyst Franklin Velez, acting in his official capacity as NYCHA's unemployment claims representative, submitted a response through SIDES and falsely accused Plaintiff of unemployment insurance fraud (affirmatively marked the claim with a **F**raud **I**ndicator: **Yes**) — a criminal offense under Article 176 of the New York Penal Code and Title 9 Section 632 of New York's unemployment insurance laws.

372.    Although Plaintiff was, in fact, working on December 28, 2022, the claim at issue concerned benefits for the weeks of September 25, 2022, through October 16, 2022 — a period during which Plaintiff had been placed on involuntary unpaid leave and had not received wages. Velez knowingly misrepresented the relevant facts to DOL by falsely stating, "Claimant is still employed. Last day worked today, 12/28/2022, clocking in at 828 am," despite the fact that Plaintiff's claim did not seek benefits for any period in December 2022, only as retroactive pay.

373.    At the time of this retaliatory and knowingly misleading submission, Velez was fully aware that Plaintiff had been on involuntary unpaid leave during the claim period, that his unemployment insurance claim had been improperly closed, and that Plaintiff was seeking to reopen the claim for that specific September–October 2022 pay period.

374.    Due to the intervention of Plaintiff's Assembly Member, NYS DOL reopened Plaintiff's claim, and retroactive benefits were eventually issued.

375.    Following Plaintiff's termination on February 3, 2023, Plaintiff contacted NYS DOL again, explaining his termination and was advised to continue certifying as his prior claim remained open to resume.

376.    In April 2023, an NYS DOL adjudicator contacted Plaintiff due to confusion created by NYCHA's false reporting. Plaintiff clarified the sequence of events, and the DOL adjudicator contacted Velez directly for additional information. Plaintiff filed a FOIL request.

377.    Plaintiff's claim was ultimately approved following this intervention. However, at no point did NYCHA retract or correct its baseless and damaging accusation of unemployment fraud, which remains a defamatory and impermissible part of the official administrative records.

## XVII.            <u>Post-Employment Retaliation and Blacklisting</u>
### *Failure to Provide COBRA Notice*

378.    After his separation from NYCHA, Plaintiff **never** received the required COBRA notice, depriving him of the equitable opportunity to continue his health insurance coverage.

### *Rescinded Employment Offers*

379.    In February or March 2023, Plaintiff received a conditional job offer from the New York City Department of Youth & Community Development ("DYCD") following a successful interview.  DYCD ceased all communication afterward. At a subsequent Hiring Hall,

a DYCD employee stated another candidate was selected after *"careful consideration,"* despite confirming Plaintiff was *"more qualified."* Said employee alluded NYCHA was "*blocking*" it.

380.    On April 18, 2023, Plaintiff received a conditional offer for a Probation Officer Trainee position with the New York City Department of Probation. He completed all their pre-employment requirements, including a background check and psychological evaluation. On May 24, 2023, Human Resources Director Zenia Melendez informed Plaintiff he was inexplicably deemed *"Psychologically Not Qualified."* Plaintiff had been required to disclose his NYCHA termination during the hiring process; with such being a continual focus for the clinical assessor conducting the psychological interview. He later discovered his NYC Department of Probation employment was even reported on his FBI NCIC records, yet rescinded at the very last moment.

381.    In April 2023, Plaintiff applied for a Job Opportunity Specialist position with the New York City Human Resources Administration ("HRA").  He received a conditional offer on May 17, 2023, with a start date of June 12 or June 20, 2023. After the start date passed with no contact, Plaintiff repeatedly followed up. On October 2, 2023, Robert S. Tenryk, Associate Staff Analyst at the NYC Department of Social Services, emailed Plaintiff a CNS letter stating he was not selected and was placed under administrative review due to his prior employment. Plaintiff appealed and followed up, but has to date received no response from HRA.

382.    On March 27, 2024, Plaintiff interviewed for a Case Manager/Benefit Opportunity Specialist position with NYC HRA. On April 24, 2024, he was informed he was under consideration and accepted the offer, completing the required intake personnel forms.

383.    After receiving no further communication, Plaintiff followed up on June 27, 2024, and again on July 31, 2024. On August 1, 2024, HRA responded, advising he would receive an

email shortly. Plaintiff was scheduled to complete the in-person hiring process on August 6, 2024, but by request, it was rescheduled for August 8, 2024.

384.    Prior to the appointment, Plaintiff was asked to complete employment history forms identical to a previous process where his application had been rejected due to his prior employment at NYCHA. Plaintiff called HRA, explained he had appealed the prior decision without receiving a response, and was advised it was "unlikely" he would be hired but could attempt to proceed.

385.    At that time, Plaintiff had just started a new job and was in training. Attending HRA's in-person process risked losing the new position without a solid guarantee of actual employment from HRA. As a result, Plaintiff declined the offer. The HRA position paid $7,000 more annually and included employer-covered health benefits, while his new role required employee contributions and deductibles for health coverage, but Plaintiff was now risk averse.

## XVIII.        Ongoing Blacklisting

### Ongoing Employment Barriers

386.    Since his termination from NYCHA, Plaintiff has actively sought alternative employment, submitting applications for over 323 positions through job platforms including Indeed, Idealist, ZipRecruiter, NYC Careers, and the New York State job board. Additionally, Plaintiff has participated in multiple NYC Hiring Halls and public job fairs in an effort to mitigate the damages inflicted on him by NYCHA's malfeasance and to secure comparable employment.

387.    Plaintiff has encountered repeated employment barriers, primarily via being regularly forced to explain his unlawful termination to any prospective civil service and private sector employers, chilling his employment prospects almost immediately.

388.     For example, after applying to the Bronx District Attorney's Office, Plaintiff was promptly contacted and held an initial positive conversation. Upon disclosing his illicit NYCHA termination, he was never contacted again and accordingly not even offered an initial interview.

### AS AND FOR A FIRST CAUSE OF ACTION
### Failure to Accommodate in Violation of the ADAAA
### *Against Defendant NYCHA*

389.     Plaintiff hereby repeats, reiterates, and re-alleges each and every previous allegation as if fully set forth herein.

390.     Plaintiff is a qualified individual with disabilities as defined by the ADAAA. Defendant NYCHA was aware of Plaintiff's disabilities, as Plaintiff submitted valid medical documentation and communicated his conditions and limitations directly to management and Human Resources, et al.

391.     By the actions and omissions described above, Defendant NYCHA violated the ADAAA by failing to provide Plaintiff with effective interim reasonable accommodations. A similarly situated, physically disabled employee (Myra Miller) was granted several varying complimentary accommodations without delay, leave, or adverse employment consequences. Despite being aware of Plaintiff's disabilities and his timely, supported accommodation request, Defendant NYCHA failed to engage in the required good faith interactive process to explore and implement a reasonable accommodation.  Instead, NYCHA delayed action on Plaintiff's request for thirty-four days, during which Plaintiff was placed on an involuntary unpaid leave, suffered a loss of wages and benefits, and was denied the opportunity to work under reasonable conditions.

392.     Defendant NYCHA's refusal and delay in providing an accommodation were not based on any legitimate, non-discriminatory, or non-retaliatory reason and constituted a clear violation of its obligations under the ADAAA.

393.     As a direct and proximate result of Defendants' violations of the ADAAA and the Rehabilitation Act, Plaintiff has suffered and continues to suffer severe emotional distress, reputational damage, economic losses including back pay and front pay, and other grievous consequential harms. Plaintiff seeks all remedies available under federal law, so including injunctive relief, compensatory damages, pro se fees, and costs.

394.     Defendant NYCHA's unlawful discriminatory actions constitute malicious, willful, and wanton violations of the ADAAA.

### AS AND FOR A SECOND CAUSE OF ACTION
**Discrimination in Violation of the ADAAA**
*Against Defendant NYCHA*

395.     Plaintiff hereby repeats, reiterates, and re-alleges each and every previous allegation as if fully set forth herein.

396.     Plaintiff was fully able to perform the essential functions of his position with or without reasonable accommodation. Critically, Defendant never initiated a Civil Service Law §72 fitness-for-duty proceeding—the only lawful mechanism for addressing alleged medical unfitness. NYCHA has used §72 in other cases, including with employees perceived to have mental health conditions, underscoring that its failure to do so here was not an oversight but a deliberate choice. The absence of a §72 referral reveals that Defendant did not genuinely believe Plaintiff was unable to perform his duties. Instead, it acted on inconsistent, unsupported, inept justifications that mask discriminatory and retaliatory motives.

397.     By the actions described above, among others, Defendant NYCHA has discriminated against Plaintiff in violation of the ADAAA in two separate departments by denying him equal terms and equal conditions of employment because of his actual or perceived mental and physical disabilities, including, but not limited to:

a. <u>EMSD Department</u>: (i) Placement on involuntary unpaid leave, and ejection from premises after Plaintiff's reasonable accommodation request; (ii) Loss of pay and benefits; (iii) Treating Plaintiff less favorably than similarly situated physically-disabled employee (Myra Miller) due to mental health stigma; (iv) Constructive demotion; and (v) Imposing pretextual disciplinary actions.

b. <u>PHTO Department</u>: (i) Constructive demotion; (ii) Inadequate training and exclusion from resources necessary to perform his job; (iii) Reassignment to hardship work locations without justification; (iv) Issuing an improper and unwarranted negative supervisory evaluation and counseling memorandum; (v) Treating Plaintiff less favorably than similarly situated non-disabled employee (Candice Edwards) due to mental health stigma; (vi) Imposing pretextual disciplinary actions; and via (vii) Termination.

398.    Defendant NYCHA's adverse actions were accompanied by shifting and inconsistent explanations, further evidencing pretext and intentional discriminatory intent.

399.    As a direct and proximate result of Defendants' violations of the ADAAA and the Rehabilitation Act, Plaintiff has suffered and continues to suffer from severe emotional distress, reputational damage, economic losses including back pay and front pay, and other consequential harms. Plaintiff seeks all remedies available under federal law, including proper injunctive relief, compensatory damages, pro se fees, and costs.

400.    Defendant NYCHA's unlawful discriminatory actions constitute malicious, willful, and wanton violations of the ADAAA.

**<u>AS AND FOR A THIRD CAUSE OF ACTION</u>**
**Retaliation in Violation of the ADAAA**
*Against Defendant NYCHA*

401.    Plaintiff hereby repeats, reiterates, and re-alleges each and every previous allegation as if fully set forth herein.

402.    By the actions described above, among others, Defendant NYCHA retaliated against Plaintiff for engaging in protected activity as related to actual or perceived mental and physical disabilities under the ADAAA, including, but not limited to:  (1) Requesting reasonable accommodations for his disabilities; (2) Opposing discriminatory treatment; (3) Reporting said

discriminatory treatment to HR; (4) Reporting discriminatory treatment to DEO; (5) Informing

DEO of his intent to file an EEOC charge; and (6) Filing an EEOC Charge of Discrimination

against Defendant NYCHA and various management officials.

403.    Defendant NYCHA, through its agents and employees, was fully aware of the

Plaintiff's protected activities, as his accommodation requests and supporting documentation

were submitted directly to management and/or HR via email, DEO notified HR of his intent to

file an EEOC charge, and the EEOC explicitly notified NYCHA of the Plaintiff's filed charges.

404.    In direct retaliation for Plaintiff's protected activity, Defendant NYCHA subjected

Plaintiff to a series of adverse employment actions, including but not limited to:

> (i) Numerous retaliatory actions at the EMSD Department, specifically, the denial of
> effective interim accommodations, placement on involuntary unpaid leave, and ejection
> from premises occurred within four (4) days of Plaintiff's reasonable accommodation
> request; (ii) Loss of pay and benefits; (iii) Constructive demotion; and (iv) Disparate
> treatment due to mental health stigma.

> (i) Numerous retaliatory actions at the PHTO Department, including inadequate training
> and disparate treatment due to mental health; (ii) Constructive demotion; (iii) Email
> account disabling, hardship transfer, forced worksite changes, unwarranted counseling
> memorandum, and an improper and untimely supervisory evaluation; occurred shortly
> after Plaintiff's December 2022 complaint to DEO and intent to file an EEOC charge; (iv)
> Termination just fifteen (15) days after Plaintiff filed his EEOC Charge of
> Discrimination; and 'Blackballed' per future employment after unlawful termination.

405.    Defendant NYCHA admitted Plaintiff was placed on an unpaid leave due to his

Reasonable Accommodation Request, and subsequently then offered shifting and inconsistent

explanations for other adverse actions, including his involuntary unpaid leave and termination.

These inconsistent explanations demonstrate pretext and a retaliatory motive. NYCHA further

failed to adhere to its own internal Human Resources Manual procedures governing employee

terminations, further evidencing pretext in Plaintiff's situation(s).

406.    As a direct and proximate result of Defendants' violations of the ADAAA and the

Rehabilitation Act, Plaintiff has suffered and continues to suffer severe emotional distress,

reputational damage, economic losses including back pay and front pay, and other consequential harms. Plaintiff seeks all remedies available under federal law, including injunctive relief, compensatory damages, pro se fees, and costs.

407.    Defendant NYCHA's unlawful and retaliatory conduct constitutes malicious, willful, and wanton violations of the ADAAA.

## AS AND FOR A FOURTH CAUSE OF ACTION
### Interference in Violation of the ADAAA
*Against Defendant NYCHA*

408.    Plaintiff hereby repeats, reiterates, and re-alleges each and every previous allegation as if fully set forth herein.

409.    Pursuant to 42 U.S.C. § 12203(b), it is unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of their rights under the ADAAA.

410.    By the actions described above, among others, Defendants unlawfully interfered with Plaintiff's rights under the ADAAA by denying him an interim reasonable accommodation, retaliating for a protected activity, subjecting Plaintiff to unwarranted discipline, for involuntary unpaid leave, loss of pay and benefits, intimidation using security interventions, his constructive demotion, disparate treatment (FC Myra Miller) & via their creating hostile work environments.

411.    As a direct and proximate result of Defendants' violations of the ADAAA, Plaintiff has suffered and continues to suffer severe emotional distress, reputational damage, economic losses including back pay and front pay, and other consequential harms. Plaintiff seeks all remedies available under federal law, including injunctive relief, compensatory damages, pro se fees, and costs.

## AS AND FOR A FIFTH CAUSE OF ACTION
### Hostile Work Environment in Violation of the ADAAA
*Against Defendant NYCHA*

412.    Plaintiff hereby repeats, reiterates, and re-alleges each and every previous allegation as if fully set forth herein.

413.    By the actions described above, among others, Defendants, by and through their agents, supervisors, and employees, have violated the ADAAA by subjecting Plaintiff to a hostile work environment on the basis of his actual or perceived mental and physical disabilities (mental health stigma).  The unlawful conduct included, but was not limited to:

> At EMSD:  (i) intimidation by a supervisor/supervisors following Plaintiff's reasonable accommodation request; (ii) placing Plaintiff on involuntary unpaid leave for 34 days; (iii) loss of health insurance benefits during said leave; (iv) calling security to remove Plaintiff from the premises; and (v) creating conditions so intolerable that Plaintiff was forced to seek a transfer, resulting in a constructive demotion.

> At PHTO: (i) persistent micromanagement; (ii) requiring daily check-in emails upon arrival; (iii) reassigning Plaintiff to multiple hardship worksites over a short period; (iv) repeatedly removing Plaintiff from his primary worksite twice a week for no legitimate reason other than to accommodate a lower-ranked employee; (v) exclusion from training and resources; (vi) subjecting him to unwarranted scrutiny and undue disparate treatment compared to non-disabled employee; and (vii) sending Plaintiff repeated emails and Teams meeting requests concerning EEO, EAP, and Workplace Violence Policy provisions from the HR manual in a manner intended to intimidate and stigmatize.

414.    This conduct was severe and pervasive enough to alter the terms and conditions of Plaintiff's employment and create an intimidating, hostile, abusive work environment to which a reasonable person with similar disabilities would find offensive, threatening, and emotionally distressing. NYCHA knew or should have known about the unlawful conduct and failed to take appropriate remedial action, instead permitting the hostile work environment to persist unabated.

415.    As a direct and proximate result of Defendants' violations of the ADAAA, Plaintiff has suffered and continues to suffer severe emotional distress, reputational damage, economic losses including back pay and front pay, and other consequential harms. Plaintiff seeks all remedies available under federal law, including injunctive relief, compensatory damages, pro se fees, and costs.

## AS AND FOR A SIXTH CAUSE OF ACTION
**Failure to Accommodate in Violation of the Rehabilitation Act of 1973, 29 U.S.C. § 794**
*Against Defendant NYCHA*

416.    Plaintiff hereby repeats, reiterates, and re-alleges each and every previous allegation, including those set forth in the First Cause of Action, as if fully set forth herein.

417.    Defendant NYCHA is a public entity and recipient of federal financial assistance subject to the requirements of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

418.    Plaintiff is a qualified individual with disabilities within the meaning of the Rehabilitation Act, as further described herein and in the preceding paragraphs.

419.    By the actions and omissions described above, NYCHA violated Section 504 of the Rehabilitation Act by failing to provide Plaintiff with proper, effective interim reasonable accommodations for his known disabilities, despite receiving timely, supported requests. This failure includes, but is not limited to, NYCHA's delay of thirty-four days in acting on Plaintiff's request, his placement on involuntary unpaid leave, and resultant loss of wages and benefits.

420.    As a direct and proximate result of Defendants' violations of the Rehabilitation Act, Plaintiff has suffered and continues to suffer severe emotional distress, reputational damage, economic losses including back pay and front pay, and other consequential harms. Plaintiff seeks all remedies available under federal law, including injunctive relief, compensatory damages, pro se fees, and costs.

421.    Defendant NYCHA's discriminatory actions constitute malicious, willful, and wanton violations of the Rehabilitation Act for which Plaintiff is entitled to an award of damages to the fullest extent permitted by law.

## AS AND FOR A SEVENTH CAUSE OF ACTION
**Discrimination in Violation of the Rehabilitation Act 1973, 29 U.S.C. § 794**
*Against Defendant NYCHA*

422.    Plaintiff hereby repeats, reiterates, and re-alleges each and every previous allegation as if fully set forth herein.

423.    By the actions described above, among others, Defendant NYCHA discriminated against Plaintiff in violation of the Rehabilitation Act, including, but not limited to subjecting him to disparate treatment, denying him equal terms and conditions of employment, placement on involuntary unpaid leave, loss of pay and benefits, constructive demotion and terminating his employment due to his actual or perceived disabilities (and implied mental health stigma).

424.    As a direct and proximate result of Defendants' violations of the Rehabilitation Act, Plaintiff has suffered and continues to suffer severe emotional distress, reputational damage, economic losses including back pay and front pay, and other consequential harms. Plaintiff seeks all remedies available under federal law, including injunctive relief, compensatory damages, pro se fees, and costs.

425.    Defendant NYCHA's unlawful discriminatory actions constitute malicious, willful, and wanton violations of the Rehabilitation Act.

### AS AND FOR AN EIGHTH CAUSE OF ACTION
**Retaliation in Violation of the Rehabilitation Act of 1973, 29 U.S.C. § 794**
*Against Defendant NYCHA*

426.    Plaintiff hereby repeats, reiterates, and re-alleges each and every previous allegation as if fully set forth herein.

427.    By the actions described above, among others, Defendant NYCHA retaliated against Plaintiff for engaging in protected activity under the Rehabilitation Act, including requesting accommodations and opposing disability discrimination. In retaliation, NYCHA subjected Plaintiff to materially adverse employment actions, including but not limited to denying effective interim accommodations, false disciplinary actions, constructive demotion,

capricious involuntary unpaid leave (4) four days after RAR filing, loss of pay and benefits, blackballing, and termination a scant (15) fifteen days after Plaintiff's comprehensive filing with the EEOC.

428.    As a direct and proximate result of Defendants' violations of the Rehabilitation Act, Plaintiff has suffered and continues to suffer severe emotional distress, reputational damage, economic losses including back pay and front pay, and other consequential harms. Plaintiff seeks all remedies available under federal law, including injunctive relief, compensatory damages, pro se fees, and costs.

429.    Defendant NYCHA's retaliatory actions were malicious, willful, and in reckless disregard of Plaintiff's federally protected rights.

**AS AND FOR A NINTH CAUSE OF ACTION**
**Hostile Work Environment in Violation of the Section 504, Rehabilitation Act 1973**
*Against Defendant NYCHA*

430.    Plaintiff hereby repeats, reiterates, and re-alleges each and every previous allegation as if fully set forth herein.

431.    By the actions described above, among others, Defendant NYCHA, a recipient of federal financial assistance, violated Section 504 of the Rehabilitation Act by subjecting Plaintiff to a hostile work environment based on his actual or perceived disabilities. The conduct was sufficiently severe and pervasive enough to alter the actual terms, conditions, and privileges of Plaintiff's employment, thereby creating an abusive and intimidating working environment.

432.    Defendant NYCHA was aware, or should have been aware, of the hostile work environment affecting Plaintiff, yet failed to take prompt, effective remedial action to address the unlawful conduct.

433.    As a direct and proximate result of Defendants' violations of the Rehabilitation

Act, Plaintiff has suffered and continues to suffer severe emotional distress, reputational damage,

economic losses including back pay and front pay, and other consequential harms. Plaintiff seeks

all remedies available under federal law, including injunctive relief, compensatory damages, pro

se fees, and costs.

**AS AND FOR A TENTH CAUSE OF ACTION**
**Failure to Accommodate in Violation of the New York State Human Rights Law**
*Against Defendants NYCHA, Murillo and Yudkovitz*

434.    Plaintiff hereby repeats, reiterates, and re-alleges each and every previous

allegation as if fully set forth herein.

435.    Plaintiff is a qualified individual with a disability under the New York Executive

Law §296, *et seq.* Defendant NYCHA had actual and/or constructive notice of Plaintiff's

disability and limitations

436.    By the actions and omissions described above, Defendant NYCHA violated the

NYSHRL by failing to provide Plaintiff with proper reasonable accommodations for his known

disability and by failing to engage in a good faith, interactive process to both determine and then

duly implement an effective interim reasonable accommodation, as required by law.

437.    Defendants' conduct under the New York State Human Rights Law was

intentional and discriminatory. As a result, Plaintiff experienced economic and emotional injury

and seeks compensatory damages, injunctive relief, and reimbursement for pro se fees pursuant

to Executive Law §§ 296 et seq.

**AS AND FOR AN ELEVENTH CAUSE OF ACTION**
**Discrimination in Violation of the New York State Human Rights Law**
*Against Defendants NYCHA, Murillo, Luciano, Aude-McCullough, Taylor, Ramseur-Deliotte,*
*Gibbs, Yudkovitz, and Donohue*

438.    Plaintiff hereby repeats, reiterates, and re-alleges each and every previous allegation as if fully set forth herein.

439.    As described above, Defendants, individually and collectively, discriminated against Plaintiff on the basis of his actual or perceived mental disabilities in violation of the New York State Human Rights Law by fostering, condoning, accepting, ratifying and/or via otherwise failing to prevent or remedy a hostile work environment and disparate treatment based on his mental and physical disabilities.

440.    Defendants' conduct under the New York State Human Rights Law was intentional and discriminatory. As a result, Plaintiff experienced economic and emotional injury and seeks compensatory damages, injunctive relief, and reimbursement for pro se fees pursuant to Executive Law §§ 296 et seq.

### AS AND FOR A TWELFTH CAUSE OF ACTION
**Retaliation in Violation of the New York State Human Rights Law**
*Against Defendants NYCHA, Murillo, Luciano, Aude-McCullough, Taylor, Ramseur-Deliotte, Gibbs, Yudkovitz, and Donohue*

441.    Plaintiff hereby repeats, reiterates, and re-alleges each and every previous allegation as if fully set forth herein.

442.    The New York State Human Rights Law ("NYSHRL"), Executive Law § 296, prohibits employers from retaliating against employees for engaging in protected activities, including requesting reasonable accommodations and opposing discriminatory practices.

443.    By the actions described above, among others, Defendant NYCHA, by the conduct described here fore, unlawfully retaliated against Plaintiff for engaging in protected activity based on his mental and physical disabilities in violation of the NYSHRL.

444.    Defendants' conduct under the New York State Human Rights Law was intentional and discriminatory. As a result, Plaintiff experienced economic and emotional injury

and seeks compensatory damages, injunctive relief, and reimbursement for pro se fees pursuant

to Executive Law §§ 296 et seq.

## AS AND FOR A THIRTEENTH CAUSE OF ACTION
**Hostile Work Environment in Violation of the New York State Human Rights Law**
*Against Defendants NYCHA, Murillo, Luciano, Taylor, Ramseur-Deliotte, and Gibbs*

445.    Plaintiff hereby repeats, reiterates, and re-alleges each and every previous

allegation fully set forth herein.

446.    By the actions described above, among others, Defendants created a hostile work

environment based on Plaintiff's actual or perceived disabilities (mental health stigma), being in

violation of the New York State Human Rights Law, N.Y. Exec. Law § 296.

447.    Defendants' conduct under the New York State Human Rights Law was fully

intentional and discriminatory. As a result, Plaintiff experienced economic and emotional injury

and seeks compensatory damages, injunctive relief, and reimbursement for pro se fees pursuant

to Executive Law §§ 296 et seq.

## AS AND FOR A FOURTEENTH CAUSE OF ACTION
**Aiding and Abetting Violations of the New York State Human Rights Law**
*Against Individual Defendants Only*

448.    Plaintiff hereby repeats, reiterates, and re-alleges each and every previous

allegation as if fully set forth herein.

449.    By the action described above, among others, individual Defendants knowingly,

willfully, and/or recklessly aided, abetted, incited, compelled, or coerced the various unlawful

discriminatory and retaliatory conduct committed against Plaintiff, in violation of the New York

State Human Rights Law ("NYSHRL"), New York Executive Law § 296(6).

450.    The individual Defendants' conduct, including but not limited to participating in discriminatory decision-making, fabricating and approving false documentation, facilitating or authorizing adverse employment actions, and retaliating against Plaintiff for his engaging in protected activities, directly contributed to the unlawful treatment Plaintiff endured/endures.

451.    Defendants' conduct under the New York State Human Rights Law was intentional and discriminatory. As a result, Plaintiff experienced economic and emotional injury and seeks compensatory damages, injunctive relief, and reimbursement for pro se fees pursuant to Executive Law §§ 296 et seq.

**AS AND FOR A FIFTEENTH CAUSE OF ACTION**
**Failure to Accommodate in Violation of New York City Human Rights Law**
*Against Defendants NYCHA, Murillo and Yudkovitz*

452.    Plaintiff hereby repeats, reiterates, and re-alleges each and every previous allegation as if fully set forth herein.

453.    Plaintiff is an individual with a disability as defined by the New York City Human Rights Law. Defendants had actual and/or constructive notice of Plaintiff's disabilities and his related functional limitations.

454.    By the actions and omissions described above, Defendants NYCHA, Murillo, and Yudkovitz failed to provide Plaintiff with effective reasonable accommodations and did not engage in a good faith, cooperative dialogue as required under NYCHRL § 8-107(15). Their conduct included the denial of effective interim accommodations, refusal to discuss alternatives, and taking adverse actions in retaliation for Plaintiff's requests.

455.    Plaintiff asserts that the individual defendants listed above participated directly in, or facilitated, these failures to accommodate. As such, they are ergo liable in their individual capacities under NYCHRL § 8-107(6) for aiding and abetting unlawful employment practices.

456.     Under the broad remedial protections of the NYCHRL, Plaintiff seeks compensatory and punitive damages for Defendants' willful and reckless disregard of his rights. Plaintiff also seeks injunctive and declaratory relief, litigation costs, pro se fees, and any other relief deemed just and proper pursuant to NYC Administrative Code §§ 8-101 et seq.

**<u>AS AND FOR A SIXTEENTH CAUSE OF ACTION</u>**
**Discrimination in Violations of New York City Human Rights Law**
*Against Defendants NYCHA, Murillo, Luciano, Aude-McCullough, Taylor, Ramseur-Deliotte, Gibbs, Yudkovitz, Donohue and Edmonson*

457.     Plaintiff hereby repeats, reiterates, and re-alleges each and every previous allegation as if fully set forth herein.

458.     Pursuant to New York City Administrative Code § 8-107(1)(a), it is an unlawful discriminatory practice for an employer or its agents to discriminate in the terms, conditions, and privileges of employment based on an individual's actual or perceived disability.

459.     Defendants NYCHA, Murillo, Luciano, Aude-McCullough, Taylor, Ramseur-Deliotte, Gibbs, Yudkovitz, Donohue, and Edmonson unlawfully discriminated against Plaintiff by denying reasonable accommodations, subjecting him to disparate treatment, interfering with his rights under the NYCHRL, and taking adverse employment actions as detailed throughout this Complaint.

460.     The individual defendants, acting in their professional and personal capacities, directly participated in or facilitated the discriminatory conduct described above. By aiding and abetting unlawful actions, they are individually liable under NYCHRL § 8-107(6).

461.     Under the broad remedial scope of the NYCHRL, Plaintiff is entitled to relief for Defendants' willful, wanton, and malicious conduct. Plaintiff seeks compensatory and punitive damages, injunctive and declaratory relief, pro se fees, litigation costs, and any other relief this Court deems just and proper pursuant to NYC Administrative Code §§ 8-101 et seq.

## AS AND FOR A SEVENTEENTH CAUSE OF ACTION
**Retaliation in Violations of New York City Human Rights Law**
*Against Defendants NYCHA, Murillo, Luciano, Aude-McCullough, Taylor, Ramseur-Deliotte, Gibbs, Yudkovitz, Donohue and Edmonson*

462.    Plaintiff hereby repeats, reiterates, and re-alleges each and every previous allegation as if fully set forth herein.

463.    Pursuant to New York City Administrative Code § 8-107(7), it is an unlawful discriminatory practice for an employer or its agents to retaliate against an individual for engaging in protected activity, including requesting reasonable accommodations and opposing unlawful practices.

464.    Plaintiff engaged in protected activity under NYCHRL by repeatedly requesting reasonable accommodations for his disabilities, reporting ongoing discrimination to NYCHA's Human Resources and Department of Equal Opportunity, and filing a formal charge with the EEOC. Within weeks of his EEOC filing, Plaintiff was impermissibly terminated, following months of escalating retaliatory treatment including forced reassignment, exclusion from training, micromanagement, and denial of essential equipment and propriety software use.

465.    Plaintiff worked alongside comparators Edwards and Miller. Edwards did not have a disability and never requested a reasonable accommodation, yet received continued support, retention, and favorable assignments. Miller, who had a physical disability and did request accommodations, was granted meaningful support and retained in her role without adverse treatment. In contrast, Plaintiff—who experienced multiple disabilities and actively sought accommodations—was constructively demoted, excluded, and terminated. This disparate treatment underscores Defendants' retaliatory and discriminatory conduct under the NYCHRL.

466.    Defendants Murillo, Luciano, Aude-McCullough, Taylor, Ramseur-Deliotte, Gibbs, Yudkovitz, Donohue, and Edmonson either directly participated in or facilitated the

retaliatory actions described above. Each is personally liable under NYCHRL § 8-107(6) for aiding and abetting retaliation against Plaintiff.

467.    Under the broad remedial protections of the NYCHRL, Plaintiff seeks compensatory and punitive damages, injunctive and declaratory relief, litigation costs, pro se fees, and such other relief as the Court deems just and proper pursuant to NYC Administrative Code §§ 8-101 et seq.

## AS AND FOR A EIGHTEENTH CAUSE OF ACTION
### Interference in Violations of New York City Human Rights Law
*Against Defendants NYCHA, Murillo, Luciano, and Yudkovitz*

468.    Plaintiff hereby repeats, reiterates, and re-alleges each and every previous allegation as if fully set forth herein.

469.    Pursuant to New York City Administrative Code § 8-107(19), it is unlawful for any person or entity to coerce, intimidate, threaten, or interfere with an individual in the exercise or enjoyment of any right protected under the NYCHRL.

470.    By the actions described above, among others, Defendants NYCHA, Murillo, Luciano, and Yudkovitz interfered with Plaintiff's protected rights by denying reasonable accommodations, obstructing the accommodation process, placing Plaintiff on involuntary medical leave without justification, subjecting him to unwarranted discipline, and creating a hostile and intimidating work environment. These actions prevented Plaintiff from exercising rights under the NYCHRL, including the right to reasonable accommodation and protection from retaliation.

471.    Plaintiff asserts individual liability under NYCHRL § 8-107(6) against Murillo, Luciano, and Yudkovitz for actively participating in or aiding and abetting the interference with Plaintiff's protected rights.

472.    Under the remedial scope of the NYCHRL, Plaintiff seeks compensatory and punitive damages, injunctive and declaratory relief, pro se fees, litigation costs, and any other relief deemed just and proper pursuant to NYC Administrative Code §§ 8-101 et seq.

### AS AND FOR A NINETEENTH CAUSE OF ACTION
**Hostile Work Environment in Violations of New York City Human Rights Law**
*Against Defendants NYCHA, Murillo, Luciano, Taylor, Ramseur-Deliotte, and Gibbs*

473.    Plaintiff hereby repeats, reiterates, and re-alleges each and every previous allegation as if fully set forth herein.

474.    Pursuant to New York City Administrative Code § 8-107(1)(a), it is an unlawful discriminatory practice for an employer or its agents to subject an employee to a hostile work environment based on actual or perceived disability, including stigma related to mental health.

475.    Defendants NYCHA, Murillo, Luciano, Taylor, Ramseur-Deliotte, and Gibbs created and maintained a hostile work environment by repeatedly denying accommodations, subjecting Plaintiff to micromanagement and exclusion, imposing involuntary leave, and also fostering a climate of humiliation, retaliation, and intimidation. The hostile conditions persisted over an extended period and were severe enough to interfere with Plaintiff's ability to perform his duties and enjoy the benefits of employment.

476.    Plaintiff asserts individual liability under NYCHRL § 8-107(6) against the named personnel for aiding and abetting the creation and continuation of the hostile environment.

477.    Plaintiff seeks compensatory and punitive damages for emotional distress, reputational harm, and career disruption; injunctive and declaratory relief; pro se fees; litigation costs; and such other relief as the Court deems just and proper pursuant to NYC Administrative Code §§ 8-101 et seq.

### AS AND FOR A TWENTIETH CAUSE OF ACTION
**Aiding And Abetting Unlawful Discrimination and Retaliation in Violation of the**

**New York City Human Rights Law**
*Against Individual Defendants Only*

478.    Plaintiff hereby repeats, reiterates, and re-alleges each and every previous allegation as if fully set forth herein.

479.    Pursuant to New York City Administrative Code § 8-107(6), it is unlawful for any person to aid, abet, incite, compel, or coerce discriminatory or retaliatory practices against another based on a protected status, including disability.

480.    The individual Defendants knowingly and willfully aided and abetted unlawful conduct against Plaintiff, including participating in discriminatory decision-making, disseminating false and pretextual disciplinary records, orchestrating adverse employment actions, and retaliating in response to Plaintiff's protected activities under the NYCHRL.

481.    These individual defendants had authority, access, and direct involvement in employment decisions and accommodation processes. Their conduct materially contributed to the harm Plaintiff experienced and reflected deliberate indifference to Plaintiff's rights under the NYCHRL.

482.    Plaintiff seeks compensatory and punitive damages, pro se fees, litigation costs, injunctive and declaratory relief, and any other remedy deemed just and proper pursuant to NYC Administrative Code §§ 8-101 et seq.

## AS AND FOR A TWENTY-FIRST CAUSE OF ACTION
**Employer Liability in Violation of the New York City Human Rights Law**
*Against Defendant NYCHA*

483.    Plaintiff hereby repeats, reiterates, and re-alleges each and every previous allegation as if fully set forth herein.

484.    In accordance with the NYCHRL's framework for employer liability, Defendant NYCHA bears legal responsibility for the conduct of its agents and supervisory personnel as

detailed below.

485.    Pursuant to NYC Administrative Code § 8-107(13), an employer is liable for discriminatory practices committed by its employees, agents, or independent contractors under the following conditions:

(a) If the violation arises under a provision other than subdivisions (1) or (2), employer liability is automatic.

(b) If the violation involves subdivisions (1) or (2), the employer is liable if:

(i) The offending employee or agent had managerial or supervisory authority;

(ii) The employer knew of the conduct, acquiesced in it, or failed to act promptly;

(iii) The employer should have known and failed to exercise reasonable diligence to prevent the misconduct.

(c) Liability also extends to independent contractors where the conduct furthered the employer's business, occurred during the course of that engagement, and the employer had actual knowledge and allowed the conduct to continue.

512.    Defendant NYCHA is liable under this provision due to its failure to prevent, respond to, and correct discriminatory and retaliatory acts committed by employees with managerial and supervisory authority, including Murillo, Luciano, Yudkovitz, Donohue, Aude-McCullough, Taylor, Ramseur-Deliotte, and others identified in this Complaint. NYCHA had actual and constructive knowledge of the misconduct and failed to implement appropriate remedial measures despite Plaintiff's multiple internal reports and reasonable accommodation requests.

513.    Plaintiff seeks compensatory and punitive damages, injunctive and declaratory relief, attorneys' fees, and all other available remedies pursuant to NYC Administrative Code §§ 8-101 et seq.

## PRAYER FOR RELIEF

Based on the foregoing facts, claims, and statutory violations, Plaintiff seeks redress through the following remedies:

**WHEREFORE,** Plaintiff respectfully requests a judgment be entered against Defendants, and that the Court grant the following relief:

A.      A declaration that Defendants' conduct, as alleged herein, violates federal, state, and city laws governing employment discrimination, retaliation, failure to accommodate, interference with protected rights, and the creation of a hostile work environment.

B.      An award of damages for all lost wages, benefits, and opportunities resulting from Defendants' unlawful actions, sufficient to make Plaintiff whole and restore financial stability.

C.      Back pay, including lost salary, overtime, bonuses, pension contributions, health, dental, and vision insurance, accrued paid time off, and fringe benefits, together with interest as permitted by law.

D.      Front pay to compensate for future economic losses, including diminished earnings capacity, delayed retirement benefits, and his lost incremental career advancement.

E.      Compensatory damages for emotional, physical, and mental suffering; reputational harm; career damage; and loss of enjoyment of life, in an amount to be determined at trial.

F.      Liquidated damages as permitted by statute.

G.      Punitive damages to punish and deter willful and malicious violations of civil rights, where authorized by law.

H.      Pre-judgment and post-judgment interest as applicable.

I.      Tax-neutralizing compensation for adverse tax consequences arising from lump-sum back pay or front pay awards, including offsets to restore Plaintiff's financial position.

J.      Injunctive relief requiring Defendants to purge Plaintiff's personnel record of all false, retaliatory, or improper documentation, including deficient performance evaluations and involuntary leave records and unlawful termination documentation.

K.      Injunctive relief mandating that Defendants provide a neutral or positive reference to prospective employers or contractors upon legitimate inquiry.

L.      Reasonable pro se fees, costs, and litigation expenses incurred in the prosecution of this action.

M.      Any other relief the Court deems just, proper, and equitable to remedy the unlawful conduct described herein.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: August  XX, 2025
Rockaway Park, New York                                    Respectfully submitted,

                                                           By:_____
                                                                Damon C. Fields

                                                           PO Box # 9403222
                                                           Rockaway Park, NY 11694
                                                           Tel: (718) 812-3789
                                                           Housing2025suit@gmail.com
                                                           *Pro se litigant*

# Exhibit A

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**New York District Office**
33 Whitehall St, 5th Floor
New York, NY 10004
(929) 506-5270
Website: www.eeoc.gov

## **DETERMINATION AND NOTICE OF RIGHTS**
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 07/11/2025

**To:** Mr. Damon Fields
    12-37 Bay Park Place
    QUEENS, NY 11691
Charge No: 520-2023-01903

EEOC Representative and email:    SILVIA DENG-BATISTA
                                  INVESTIGATOR
                                  SILVIA.DENG-BATISTA@EEOC.GOV

---

### **DETERMINATION AND NOTICE OF RIGHTS**

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### **NOTICE OF YOUR RIGHT TO SUE**

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 520-2023-01903

On behalf of the Commission,

Digitally Signed By:Arlean Nieto
07/11/2025

Arlean Nieto
Acting District Director